**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH FELTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-821-JAR |
| | ) | |
| LEWIS E. REED, | ) | |
| ST. LOUIS BOARD OF ALDERMEN, | ) | |
| PRESIDENT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT**

On January 26, 2019, Plaintiff Sarah Felts used Twitter—the type of platform the Supreme Court has recognized as "the modern public square"—to communicate with her local elected official, Defendant Lewis Reed, President of the City of St. Louis Board of Aldermen. *Packingham v. North Carolina*, 137 S. Ct. 1730, 1737 (2017). Ms. Felts tagged President Reed in a tweet asking about his stance on closing "the Workhouse," a medium security institution owned and operated by the City of St. Louis. Instead of answering his constituent, President Reed blocked Ms. Felts from the designated public forum he created when he opened the interactive component of his government-controlled account to the public. President Reed, acting under color of state law, engaged in impermissible viewpoint discrimination and violated Ms. Felts' First Amendment rights when he blocked her from participating in the designated public forum he opened.

**SUMMARY OF UNCONTROVERTED MATERIAL FACTS**

Twitter is a social media platform that allows users to publish short messages called "tweets." Statement of Uncontroverted Material Facts ("SUMF") ¶ 19. In March 2009, two years

after he began his first term as President of the St. Louis Board of Aldermen, President Reed created a Twitter account with the account identifier 27172787 and the handle @PresReed (the "Account"). *Id.* ¶¶ 4–5, 23–24, 44–46. President Reed has most frequently operated the Account using the handle @PresReed. *Id.* ¶ 47. Because the Account is configured to be "public," any other account is generally able to access its "interactive component": a set of features that enables interactions between accounts. *Id.* ¶¶ 33–36, 60. Any user who is not blocked can like, reply, or retweet the Account's posts, as well as like, quote, and otherwise interact with tweets that have replied to President Reed's tweets. *Id.* ¶¶ 60–61. Twitter users may also "tag" the Account in a tweet, and, generally, a tagged account will receive notice that it has been tagged unless someone has taken action to prevent such notification. *Id.* ¶¶ 34–35.

President Reed uses the Account as a tool of governance: he announces official actions, *id.* ¶¶ 91, 95, 106; issues official press releases from the Office of the President of the Board of Aldermen (the "Office"), *id.* ¶¶ 108–09; broadcasts important health and safety alerts for St. Louis residents, *id.* ¶¶ 92, 95, 103; and solicits public input on issues before the Board of Aldermen on the Account, *id.* ¶¶ 101–02. President Reed maintains the Account using government resources; for example, city employees create graphics for use in his tweets and he consults them about the content of messages. *Id.* ¶¶ 68–70, 102. In April 2019, one of the Office's employees requested that the IT department create a webpage for the Board of Aldermen President's Office that included a live feed of the Account's tweets. *Id.* ¶¶ 71–75.  After receiving this request, city employees added a link to the Account and live feed of its tweets to the Office's page on the City of St. Louis website. *Id.* ¶¶ 76–86. As late as December 2020, the Office's webpage included an embedded live feed of the Account's tweets, and the Account correspondingly linked to the Office's page. *Id.* ¶¶

85–86. Additionally, President Reed's profile on the City of St. Louis' website links to the Twitter page currently associated with the @PresReed handle. *Id.* ¶ 87; *see also id.* ¶¶ 27, 52.

President Reed generally allows other Twitter users to engage with the interactive component of the Account however they please. *Id.* ¶¶ 56–61. The Account does not display any content moderation policy, *id.* ¶ 58, and any Twitter user who is not blocked can freely like, reply, or retweet the Account's posts, *id.* ¶ 60, as well as like, quote or otherwise participate in the comment section of the Account's posts, *id.* ¶ 61. President Reed does, however, block individual users. *Id.* ¶¶ 159–60. Explanations for these blocks vary: President Reed explained he blocked one user "because she was saying outrageous stuff during [a Board of Aldermen campaign]," *id.* ¶ 159, and another because the user was an employee of a political rival "not engaged in city business" and "not trying to find out about Board of Aldermen issues," *id.* ¶ 160.

On January 26, 2019, Sarah Felts, a constituent of President Reed, *id.* ¶¶ 1, 112, tagged the Account and asked President Reed to clarify his position on closing the Workhouse, which was a subject of "contentious" public debate, *id.* ¶¶ 116–17. She tweeted: "What do you mean by 'change the messaging around #CloseTheWorkhouse,' @PresReed? #STLBOA #aldergeddon2019 #WokeVoterSTL." *Id.* ¶ 118. Within hours, President Reed blocked Ms. Felts' Twitter account, preventing her from accessing and participating in the interactive component of the Account. *Id.* ¶¶ 43, 119–23.  Ms. Felts' account remained blocked until at least June 23, 2020, the date this lawsuit was filed. *Id.* ¶ 125. Though President Reed initially stated he could not remember the tweet or why he blocked Ms. Felts, *id.* ¶¶ 126–27, he has more recently claimed he blocked her because he interprets the hashtag "aldergeddon2019" to signify, among other things, "war and destruction on the Board of Aldermen," *id.* ¶ 153. As of August 13, 2021, President Reed had never asked anyone else about their interpretation of the hashtag. *Id.* ¶ 155.

3

## LEGAL STANDARD

The movant is entitled to summary judgment if they can "show that there is no genuine dispute as to any material fact" and they are "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). After the movant carries this burden, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986), the "nonmoving party must show the existence of facts on the record which create a genuine issue," *Larson v. Kempker*, 414 F.3d 936, 939 (8th Cir. 2005). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

### I.      THE INTERACTIVE COMPONENT OF THE ACCOUNT IS A DESIGNATED PUBLIC FORUM

The government is subject to "a 'forum based' approach for assessing restrictions that [it] seeks to place on the use of its property," *Int'l Soc. for Krishna Consciousness v. Lee*, 505 U.S. 672, 678 (1992), as well as restrictions on "private property devoted to public use," *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 801 (1985). "The same principles are applicable" to physical spaces and "metaphysical" space like the interactive component of a Twitter account. *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 830 (1995). In defining the forum, courts "focus[] on the access sought by the speaker." *Cornelius*, 473 U.S. at 788. The forum is public when the government "intentionally open[s] a nontraditional forum for public discourse." *Id.* There is no genuine dispute as to any material fact establishing that the interactive component of President Reed's account is a designated public forum.

### A.  President Reed exercised government control over the Account.

As this Court recognized, "[o]ther courts have . . . found the interactive space of a social media page amenable to public forum analysis." Memo. & Order, Doc. 21 at 6. In those cases, the

4

government "retain[ed] substantial control over" the social media pages at issue, *Davison v. Randall*, 912 F.3d 666, 683 (4th Cir. 2019) (citing *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 547, 555 (1975)), enabling the government to "devote[] [the property] to public use," *see Cornelius*, 473 U.S. at 801. President Reed retained a similar level of control over the Account. *See Davison*, 912 F.3d at 683–84 (discussing ways in which a government official exercised control over a social media account). He is responsible for its creation, SUMF ¶ 44, and "operated and oversaw" the account at the time of the block, *id.* ¶ 48. President Reed also controlled the content of the Account's tweets, which generally reference him and his official activities. *Id.* ¶ 44, 91–109; *see Knight First Amend. Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 567 (S.D.N.Y. 2018) (finding President Trump's ability to "control the content of the tweets" sent from his account indicative of government control), *aff'd*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (vacated with instructions to dismiss as moot because President Trump had left office) [hereinafter *Knight I*]. He also exercised control over access to the interactive component of the Account by using the block feature, SUMF ¶¶ 59, 119, the "aspect" of the Account "giving rise" to Ms. Felts' claim, *Davison*, 912 F.3d at 685.

In operating the Account, President Reed was not acting as a private citizen but in an official capacity. While he was already President, he created the Account using the handle "@PresReed," directly referring to his status as a government official, and the Account remained under that name for most of its operation. SUMF ¶¶ 44, 46–49; *see Campbell v. Reisch*, 986 F.3d 822, 826 (8th Cir. 2021) (finding the status of an account at creation is relevant to whether it is personal or governmental). President Reed used the Account to "further [his] duties as a municipal official." *Davison*, 912 F.3d at 680. He announced official actions and issued official press releases

5

using the Account. SUMF ¶¶ 91, 95–96, 101, 103, 106–09. He frequently used the Account to

inform constituents of the actions he took as President of the Board of Aldermen, including his

introduction of bills to the Board of Aldermen. *Id.* ¶¶ 96, 97, 99–100, 106–07; *see Knight First*

*Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 236 (2d Cir. 2019) (finding President

Trump's use of his account to announce "matters related to official government business" and

"policy decisions and initiatives" demonstrated "non-private nature" of account), *cert. granted,*

*judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220

(2021) [hereinafter *Knight II*]. He used the Account as a method of informing the public about

important health and safety concerns in the city. SUMF ¶ 92 (tweeting "I'm proud to announce the

organization of the Coronavirus Special Committee of the #STLBOA"); *id.* ¶ 106 (announcing a

partnership between the Office of the President of the Board of Aldermen and "Lock it for Love"

to provide free gun locks); *see Davison*, 912 F.3d at 680 (defendant's use of social media page to

"inform the public about serious public safety events and to keep her constituents abreast of the

County's response to a snowstorm and to coordinate snow removal activities" supported finding

that the page was "created and administered . . . to 'perform[ ] actual or apparent dut[ies] of h[er]

office'" (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995))); *see also* SUMF ¶¶ 17–18.

He also used the Account to solicit the opinions of his constituents and to communicate with the

press. SUMF ¶¶ 101–03 (tweeting "we want to hear from you" and posting a link to the City

website). The Account was used primarily for "official governmental activity." *Campbell*, 986

F.3d at 826.

Members of President Reed's staff had access to, assisted in the operation of, and created

content to be posted on the Account. *See Knight II*, 928 F.3d at 235 (finding President Trump's

use of White House staff supported conclusion that account was government controlled). President

Reed consulted his staff—over whom he has "ultimate authority—when drafting tweets, and they assisted in checking information before the messages were released. SUMF ¶¶ 16, 62–69. Employees of the Office also created graphics for use in his tweets, *id.* ¶ 70. An Office employee requested city employees include President Reed's Twitter information when creating his official page on the City of St. Louis' website, and when that website was created a live feed of everything he posted from the Account appeared there. *Id.* ¶¶ 71–86. A private citizen could not have operated the Account as President Reed did. *See Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *7 (S.D. Cal. Sept. 26, 2019) (finding defendants' "ability to post about district events they attended and share Board information was due to their positions as public officials"). Instead, in operating the Account, President Reed "[held] out and use[d] a social media account open to the public as an official account for conducting official business." *Knight II*, 928 F.3d at 236. President Reed acts in an official capacity in operating the Account, including when he used it to block Ms. Felts' access to a public forum. *See id.* ("Because the President, as we have seen, acts in an official capacity when he tweets, we conclude that he acts in the same capacity when he blocks those who disagree with him.").

### B.  The interactive component of the Account is the forum at issue.

Forum analysis is a precise inquiry "tailored" to the access the speaker seeks. *Cornelius*, 473 U.S. at 801. This Court has already "determined that the interactive component of a public official's social media account is susceptible to forum analysis." Doc. 21 at 7. Here, Ms. Felts only seeks access to the interactive component of the Account. SUMF ¶ 124. Ms. Felts' use of the interactive component does not inhibit President Reed's speech. Likes, comments, and other interactive features do not compete with his tweets for space. *See id.* ¶¶ 29–30; *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 478 (2009) (explaining forum analysis is applicable, and the government speech doctrine inapplicable, where "government-owned property . . . [is] capable

7

of accommodating a large number of public speakers without defeating [its] essential function"). For these reasons, the "majority of courts that have addressed the issue" have concluded that where, as here, "a government official uses a social media account for official business, and when the interactive portions of the account are open for public comment," the interactive component constitutes a forum. Doc. 21 at 7.

### C. President Reed intentionally opened the interactive component of the Account for public discourse.

The government creates a designated public forum when it "intentionally open[s] [a space] for public discourse." *Cornelius*, 473 U.S. at 802. The government's intent is judged by its "policy and practice" regarding the forum and the "nature of the property and its compatibility with expressive activity." *Id.*

> ### 1. President Reed's policy and practice treated the interactive component of the Account as a designated public forum.

The Account is open for "indiscriminate use by the general public." *Perry Ed. Assn. v. Perry Loc. Educators' Assn.*, 460 U.S. 37, 47 (1983). President Reed has final authority to regulate use of the Account, SUMF ¶¶ 55–57, 59, and he admits that he allows any Twitter user who is not blocked to freely like, reply or retweet the Account's posts, *id.* ¶ 60, as well as like, quote, or otherwise participate in the comment section of the Account's posts, *id.* ¶ 61. The Account does not state its interactive component is subject to any content restrictions. *Id.* ¶ 58; *cf. Charudattan v. Darnell*, 510 F. Supp. 3d 1101, 1105 (N.D. Fla. 2020) ("[T]he page includes a notice saying that comments or posts violating the page's contents policy will be removed."). Instead, as in *Trump* and *Davison*, the Account bears the "hallmarks of a public forum." Doc. 21 at 8; *see Davison*, 912 F.3d at 682. Like President Trump, President Reed held out the Account as a way to "communicate with . . . constituents," SUMF ¶ 94, and the Account was "accessible to the public at large"; anyone not blocked could participate. *Knight I*, 302 F. Supp. 3d at 541; SUMF ¶¶ 60–61.

Further, President Reed's policies opened the Account to speech on any topic, but he specifically "invited" discussion of his policy positions and official duties, exactly the type of discussion in Ms. Felts' tweet. SUMF ¶¶ 53–54, 115; *see Davison*, 912 F.3d at 682. President Reed admits that he uses the Account to "interact with and engage with his constituents regarding important official policies." SUMF ¶ 53. He encouraged other members of the Board of Aldermen to use Twitter to interact with their constituents. *Id.* ¶ 94. He held out the Account to the public as a place for discussing "key issues" by clothing the Account in the trappings of his office and routinely posting about official matters. *Davison*, 912 F.3d at 674; s*upra* Part I.A. When the public accepted President Reed's invitation to use the interactive component of the Account for public discussion, he occasionally expressed approval by replying to these users' tweets. SUMF ¶ 54.

### 2. *The interactive component of the Account is compatible with expression.*

This Court, among others, has recognized that "Twitter accounts are compatible with expressive activity because they are interactive and constituents use these accounts to engage with their representatives." Doc. 21 at 8; *see also Knight II*, 928 F.3d at 236 ("[T]he factors pointing to the public, non–private nature of the [Twitter] Account and its interactive features are overwhelming."). President Reed embraced this interactivity by creating and maintaining a public Twitter account, enabling any account that he had not blocked to engage in speech in the interactive component of the Account. SUMF ¶¶ 21, 32–33, 60–61.

**II.      PRESIDENT REED VIOLATED MS. FELTS' FIRST AMENDMENT RIGHTS BY BLOCKING HER ACCESS TO THE INTERACTIVE COMPONENT OF THE ACCOUNT IN AN ACT OF UNCONSTITUTIONAL VIEWPOINT AND CONTENT DISCRIMINATION**

"[T]he government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger*, 515 U.S. at 828. President Reed did exactly this when he engaged in an act of unconstitutional viewpoint discrimination by blocking Ms. Felts from the interactive

component of the Account merely for asking a critical question about the Workhouse. SUMF ¶¶ 116–19; *see Rosenberger*, 515 U.S. at 829. Even assuming President Reed had a content-based policy and blocked Ms. Felts due to his purported interpretation of the hashtag "Aldergeddon" as a threat, SUMF ¶ 153, this content-based restriction was neither narrowly tailored nor did it serve a compelling government interest. *See Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

### A. President Reed's block of Ms. Felts was unconstitutional viewpoint discrimination.

The government engages in viewpoint discrimination when it restricts speech based on "the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 828–29. Viewpoint discrimination is impermissible in any forum, *see Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885 (2018), and presumptively unconstitutional, *see Rosenberger*, 515 U.S. at 828. This is true even when "the ideas [expressed by the speakers] are themselves offensive to some of their hearers." *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017).

President Reed engaged in viewpoint discrimination in the designated public forum component of the Account. President Reed admitted he "uses his Twitter account to interact with and engage with his constituents regarding important official policies." SUMF ¶ 53. However, he blocked Ms. Felts, his constituent, after she questioned his policy stance on the Workhouse. *Id.* ¶¶ 112, 116–19. As in *Rosenberger*, President Reed blocked Ms. Felts not for the subject matter of her speech—he used the Account to engage with constituents about his policies—but for her *opinion*, an act of impermissible viewpoint discrimination. *See Rosenberger*, 515 U.S. at 829 ("When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant."). As explained in *Davison*, blocking users to suppress "comments critical of [a public official's] . . . actions" is impermissible viewpoint discrimination. *Davison*, 912 F.3d at 688.

10

President Reed's current claim he blocked Ms. Felts for her use of the Aldergeddon hashtag is merely a pretext for viewpoint discrimination. Though President Reed initially admitted he could not remember whether or why he blocked Ms. Felts, SUMF ¶¶ 126–27, he has recently asserted he blocked Ms. Felts due to her use of the Aldergeddon hashtag, *id.* ¶ 128, which he claims refers to the violent destruction of the Board of Aldermen, *id.* ¶ 153. In analogous situations, courts have found inconsistent explanations of government actions evince a pretext for an unlawful government action. *See, e.g.*, *Am. Freedom Def. Initiative v. Washington Metro. Area Transit Auth.*, 901 F.3d 356, 366 (D.C. Cir. 2018) ("[I]f the Government proffers one reason when closing the forum but another when it later defends the closing, then that in itself is evidence of pretext."). Further, despite his stated concern over the hashtag, SUMF ¶¶ 153–54, 158, President Reed admitted he would not currently block another user who previously used the Aldergeddon hashtag in a tweet tagging him, *id.* ¶¶ 161–67. Similarly, despite his stated concern about the term, President Reed unblocked Ms. Felts after she filed her complaint. *Id.* ¶ 125. This inconsistent behavior provides "strong evidence of viewpoint discrimination." *Am. Freedom Def. Initiative*, 901 F.3d at 368; *see also Cuffley v. Mickes*, 208 F.3d 702, 711 (8th Cir. 2000) (noting the government's failure to consistently abide by its own criteria regulating which applicants could adopt a highway evinced a pretext for viewpoint discrimination). Finally, President Reed said he never asked anyone what Aldergeddon meant, SUMF ¶ 155—simply that he, along with finding it threatening, takes offense to it, *id.* ¶ 157. Yet a local newspaper article, *id.* ¶ 130, other Twitter users, *id.* ¶¶ 131–52, and Ms. Felts herself, *id.* ¶ 129, used the hashtag to refer to a local 2019 political race.

Even if President Reed's present explanation is genuine, his personal offense to the term Aldergeddon constitutes viewpoint discrimination. The Fifth Circuit, considering public officials'

11

ban of a user from an official Facebook page, explained that "[o]fficial censorship based on a state actor's subjective judgment that the content of protected speech is offensive or inappropriate is viewpoint discrimination." *Robinson v. Hunt Cty.*, 921 F.3d 440, 447 (5th Cir. 2019). Regardless of President Reed's subjective offense, blocking based on the use of offensive but otherwise protected speech remains unconstitutional viewpoint discrimination. *Id.*

### B. Blocking Ms. Felts was at least unconstitutional content discrimination.

President Reed's block of Ms. Felts was at least content-based discrimination. Content-based restrictions apply "to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, including restrictions that "cannot be 'justified without reference to the content of the regulated speech,'" *id.* at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Content-based restrictions are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve a compelling government interest. *See id*. at 163.

President Reed claims he blocked Ms. Felts based solely on her reference to the term "Aldergeddon." SUMF ¶ 128. This content-based restriction, however, is neither narrowly tailored nor serves a compelling government interest. First, the block does not serve a compelling government interest; the Aldergeddon hashtag cannot objectively be interpreted as a true threat, nor can it reasonably be interpreted as incitement.[1] Additionally, even if there were a compelling government interest, the block was not narrowly tailored to actually serve the interest. President Reed's own statements evince he is concerned about some individuals being "radicalized" through

---

[1] *See United States v. Ivers*, 967 F.3d 709, 718 (8th Cir. 2020) (noting the Eighth Circuit uses an objective standard to conclude whether, given the totality of the circumstances surrounding the communication, "the recipient of the alleged threat could reasonably conclude that it expresses a determination or intent to injure presently or in the future"); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (noting only "advocacy . . . directed to inciting or producing *imminent* lawless action and is *likely* to incite or produce such action" can be constitutionally forbidden) (emphasis added).

the use of the Aldergeddon hashtag. SUMF ¶ 154. Blocking Ms. Felts does not remove her tweet from the Internet, *id.* ¶¶ 122–23; other Twitter users could still see it and act on it. Second, if President Reed does not want to *see* the hashtag, he could have merely muted Ms. Felts, not blocked her. *See Knight I*, 302 F. Supp. 3d at 576.

**III.**     **PRESIDENT REED OPERATED THE ACCOUNT UNDER COLOR OF STATE LAW**

A claim under 42 U.S.C. § 1983 requires that the government official was acting under color of state law. There is no genuine dispute of material fact establishing that President Reed operated his account and blocked Ms. Felts from its interactive component under color of law.

An official "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *West v. Atkins*, 487 U.S. 42, 50 (1988). As this Court has stated, "[a]n action is taken under color of law if it is fairly attributable to a government entity." Doc. 21 at 11 (citing *Meier v. St. Louis*, 934 F.3d 824, 829 (8th Cir. 2019)). Municipal liability may be grounded on the single act of a policymaker. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("[A]n unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."). There is no requirement that the state actor operate strictly within the bounds of the defined duties ascribed to his office by law. *Johnson v. Phillips*, 664 F.3d 232, 240 (8th Cir. 2011). Instead, "[t]he element is satisfied if the defendant acts or purports to act in the performance of official duties." *Id.* When administering a social media account, a government official is acting under color of law when "the page is clothed in the 'power and prestige of [his] state office' and administered 'to perform actual or apparent duties of [the] office.'" Doc. 21 at 11 (quoting *Davison*, 912 F.3d at 680–81).

Determining what is "fairly attributable" to the state is a fact-based analysis; courts look to the "nature and circumstances of the [official's] conduct and the relationship of that conduct to the performance of his official duties." *Lee ex rel. Lee v. Borders*, 764 F.3d 966, 971 (8th Cir. 2014) (quoting *Roe v. Humke*, 128 F.3d 1213, 1216 (8th Cir. 1997)) (internal quotation marks omitted). As the Supreme Court has said, "what is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295–96 (2001).

President Reed's use of the Account demonstrates his actions are fairly attributable to the government. He created the Account to represent him online in his capacity as the President of the Board of Aldermen, not as a private citizen. *Supra* Part I.A; SUMF ¶¶ 44–47. He was already President when he created the Account and continued to operate it as an online extension of his role as President of the Board of Aldermen. SUMF ¶ 46; *cf. Campbell*, 986 F.3d at 826.

President Reed consistently used the Account "to perform actual or apparent duties of [his] office." *Davison*, 912 F.3d at 680. Much of what was done on the Account was "official governmental activity." *Campbell*, 986 F.3d at 826. President Reed issued press releases, communicated with other government officials, solicited information from the public, and informed his constituents of official matters. *Supra* Part I.A; SUMF ¶¶ 91–109; *cf. Knight II*, 928 F.3d at 236 (finding state action where President Trump used account to announce "matters related to official government business" and "policy decisions and initiatives"); *Davison*, 912 F.3d at 680 (finding state action where defendant used social media page to "inform the public about serious public safety events and to keep her constituents abreast of the County's response to a snowstorm and to coordinate snow removal activities"). President Reed "consistently used the Account as an important tool of governance and executive outreach." *Knight II*, 928 F.3d at 226.

14

The Account was also "clothed . . . in the "power and prestige of [his] state office."

*Davison*, 912 F.3d at 681 (quoting *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979)) (internal

quotation marks omitted). The description and handle of the Account referred to him in his official

position as President of the Board of Aldermen. SUMF ¶¶ 44–49. At the time of filing this suit,

the Office of the President of the Board of Aldermen website, maintained by the City of St. Louis,

included a link to the Account as one of the available methods of communicating with President

Reed and an embedded live feed of the Account so that every message President Reed

communicated using Twitter would simultaneously appear there. *Id.* ¶¶ 37–39, 83–86. Similarly,

prior to the filing of this suit, the Account also linked back to that official page. *Id.* ¶ 90. Moreover,

President Reed's profile on the City of St. Louis' website links to the Twitter page currently

associated with the @PresReed handle. *Id.* ¶ 87. President Reed also used city employees to assist

his operation of the Account. *Id.* ¶¶ 16, 62–83; *supra* Part I.A; *cf. Knight II*, 928 F.3d at 235. A

member of the public who encountered either the Account or President Reed's page on the official

city website would be justified in assuming that the Account was an official mouthpiece of the

Office of the President of the Board of Aldermen.

The Account contained all the trappings of an official account. President Reed frequently

used the Account to perform duties as the President of the Board of Aldermen. *Supra* Part I.A;

SUMF ¶¶ 91–109. This was not a personal account created by a private citizen who happened to

become a public official. Instead, the Account appears to be and was operated as an "organ of

official business." *Campbell*, 986 F.3d at 826. As such, the actions the Account takes are "fairly

attributable" to the state. *Davison*, 912 F.3d at 680; *see also Knight II*, 928 F.3d at 236. While

President Reed was entitled as an elected official to create a personal account and block any

individuals he desired, when he created and operated a Twitter account that appeared and acted as

15

a constituent part of the Office, he was acting under color of state law. *See Knight First Amend. Inst. at Columbia Univ. v. Trump*, 953 F.3d 216, 219–220 (2d Cir. 2020). When President Reed blocked Ms. Felts under color of law, he unconstitutionally violated her First Amendment right to express herself in a designated public forum.  *See id.*

## IV.     MS. FELTS HAS BEEN INJURED AND IS ENTITLED TO RELIEF

A plaintiff is injured when, as here, a government official unconstitutionally prevents her (even momentarily) from engaging in expressive activity. *See Johnson v. Minneapolis Park & Rec. Bd.*, 729 F.3d 1094, 1101–02 (8th Cir. 2013) (holding, in the preliminary injunction context, "'loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *Snider v. City of Cape Girardeau*, No. 1:10-CV-100 CEJ, 2012 WL 6553710, at *2 (E.D. Mo. Dec. 14, 2012) (awarding compensatory damages to litigant who proved constitutional violation despite "no evidence that the plaintiff sustained any physical injury, mental distress, humiliation, financial loss, or other adverse effects" and discussing *Kerman v. City of New York*, 374 F.3d 93, 125–26 (2d Cir. 2004), which also held that "even absent [ ] other injuries," a plaintiff was entitled to damages for a brief unconstitutional impingement on his liberty interest), *aff'd*, 752 F.3d 1149, 1154 (8th Cir. 2014). Ms. Felts was blocked from January 26, 2019, through at least June 23, 2020.  SUMF ¶¶ 119, 125.

Because there is an injury, there is a remedy. "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Marbury v. Madison*, 5 U.S. 137, 163 (1803). Because the absence of a genuine dispute about any material facts entitles Ms. Felts to judgment in her favor as a matter of law, she is entitled to relief.

Because Ms. Felts is entitled to summary judgment, declaratory judgment that the interactive component of the Account is a designated public forum operated under color of law

and that President Reed's block of her based on the viewpoint or content of her message violates the First Amendment is appropriate. Declaratory judgment is appropriate relief in a § 1983 claim seeking equitable relief, such as this case. *See, e.g.*, *Phelps-Roper v. Koster*, 734 F. Supp. 2d 870, 882 (W.D. Mo. 2010), *aff'd in part, rev'd in part on other grounds, and remanded*, 713 F.3d 942 (8th Cir. 2013). Declaratory judgment is appropriate where resolution of a controversy would benefit from "specific relief through a decree of a conclusive nature, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Calderon v. Ashmus*, 523 U.S. 740, 746 (1998) (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)).

As relief for the past violation of her constitutional rights, Ms. Felts is also entitled to an award of damages. A party is entitled to an award of damages when her constitutional rights are violated because of the "importance to organized society that those rights be scrupulously observed." *Carey v. Piphus*, 435 U.S. 247, 266 (1978). Here Ms. Felts seeks merely nominal damages. *See Farrar v. Hobby*, 506 U.S. 103, 112 (1992) ("*Carey* obligates a court to award nominal damages when a plaintiff establishes the violation of his [constitutional] right . . . but cannot prove actual injury."). The Supreme Court recently reaffirmed that relief for a completed violation of a legal right may be remedied in a case that might otherwise be moot by an award of nominal damages. *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021).

Ms. Felts is also entitled to a permanent injunction preventing President Reed from continuing to block those with whom he disagrees from the designated public forum he operates under color of law. A permanent injunction is appropriate where plaintiffs show: (1) actual success on the merits; (2) irreparable harm; (3) that the harm to the plaintiff outweighs any harm to others from an injunction; and (4) that an injunction serves the public interest. *Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008). Summary judgment in favor of Ms.

Felts constitutes success on the merits. She will suffer irreparable harm if an injunction does not issue, because, absent an injunction, President Reed can continue his practice of blocking individuals from the designated public forum he operates under color of law. The balance of equities weighs in favor of an injunction because there is no evidence of harm to others from the injunction and the injunction can be crafted to address any concerns about legitimately threatening messages. Finally, because "it is always in the public interest to protect constitutional rights," *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678 (8th Cir. 2012), the public interest also favors entry of an injunction.

## CONCLUSION

For the foregoing reasons, Ms. Felts respectfully requests that this Court grant her summary judgment as follows:

A) Find Defendant's viewpoint-based and/or content-based blocking of Plaintiff from the Twitter account with the account identifier 27172787—which formerly operated using the handle @PresReed and currently operates using the handle @LewisReedSTL (the "Account")—constitutes a violation of the First Amendment;

B) Enter an injunction:

1. Directing Defendant to take all necessary action to reverse any blocking of any user by the Account; and

2. Prohibiting the President of the Board of Aldermen and employees, agents or anyone acting on behalf of the Office of the President of the Board of Aldermen, from using any account on a social media platform (meaning any online, computing, or digital platform—including, but not limited to, Twitter and similar microblogging or social

18

network services—on which users may display, post, share, or otherwise transmit content, media, information, or other communication) that has been accessed, promoted, or supported using any resources of the City of St. Louis (which resources shall include any officer, agent, or employee of the City of St. Louis and any property owned, leased, or otherwise belonging to or paid for, in full or in part, by the City of St. Louis) in a way that makes use of any ability or capability of the platform:

a. for one user to directly or indirectly modify, alter, change, restrict, limit, or otherwise influence another user's ability to access the interactive component of such account; or

b. for one user to directly or indirectly modify, alter, change, restrict, limit, or otherwise influence another user's access to the platform or to particular content, users, features, or functionality available on the platform

in a manner that allows any access or degree of access to one or more users but fewer than all users;

C) Allowing an exception to this prohibition that permits the President of the Board of Aldermen and employees, agents, or anyone acting on behalf of the Office of the President of the Board of Aldermen, to block any user who posts a true threat as a tweet in reply to a tweet by the Account or who that tags the Account in a true threat, provided that Defendant shall provide to Plaintiff's counsel on or before the first day of January, April, July, and October a report listing all users so blocked and the text of the message interpreted as a true threat.  The first report shall provide such information for all users blocked since the date of judgment.  Future reports shall provide such information for all users blocked since the previous report;

19

D) Award Plaintiff nominal damages, reasonable costs, and attorneys' fees pursuant to 42

U.S.C. § 1988 and any other applicable provisions of law; and

E) Provide such other or further injunctive relief or other relief as appropriate.

DATED: October 12, 2021                    Respectfully Submitted,

s/ Lisa S. Hoppenjans
Lisa S. Hoppenjans, #63890 (MO)
Tobin Raju, #5638523 (NY)
Alida Babcock (law student authorized
  under E.D. Mo. L.R. 12.05)
Charles Clark (law student authorized
  under E.D. Mo. L.R. 12.05)
Andrew Stubbs (law student authorized
  under E.D. Mo. L.R. 12.05)
First Amendment Clinic
Washington University in St. Louis
School of Law
One Brookings Drive
Campus Box 1120
St. Louis, MO 63130
Phone: (314) 935-8980
lhoppenjans@wustl.edu
tobinraju@wustl.edu

Anthony E. Rothert, #44827 (MO)
Jessie Steffan, #64861 (MO)
Molly Carney, #70570 (MO)
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 669-3420
arothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org

Gillian R. Wilcox, #61278 (MO)
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (314) 652-3114
gwilcox@aclu-mo.org

**ATTORNEYS FOR PLAINTIFFS**

20