IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SARAH FELTS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:20-cv-821-JAR |
| ) | |
| LEWIS E. REED, ) | |
| ST. LOUIS BOARD OF ALDERMEN, ) | |
| PRESIDENT, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant President Reed's Motion for Summary Judgment ("Defendant's Motion") claims Plaintiff Sarah Felts cannot establish (1) *Monell* liability against the City of St. Louis ("the City") for President Reed's action of blocking her on Twitter; and (2) that the Twitter account operated by President Reed was a personal account and thus not operated "under color of state law" when he blocked Ms. Felts.

Defendant is wrong on both counts. First, *Monell* liability is established because President Reed has final policy making authority to represent the Office of the President of the Board of Aldermen on social media. Second, President Reed's administration, use, and interaction with his constituents and public officials on his Twitter account (with account identifier 27172787) (the "Account") demonstrate that he operated the Account under color of state law when he blocked Ms. Felts on Twitter.

Accordingly, this Court should deny Defendant's Motion and grant Plaintiff Sarah Felts' Motion for Summary Judgment.

## STATEMENT OF MATERIAL FACTS[1]

Lewis Reed has held the Office of President of the Board of Aldermen of the City of St. Louis ("the Office"), elected at-large by all City voters, since 2007. Doc. 91, ¶¶ 1–2; Doc. 91, Add'l Facts ¶ 1. President Reed is the highest authority within the Office, and answers to no one within city government. Doc. 91, Add'l Facts ¶ 4. As such, President Reed has broad control over the Office's operation. He has sole authority to hire and fire Office employees, *id.* ¶ 2, and is the "ultimate person who has authority over" all Office employees, *id.* ¶ 18. He controls authorization to speak for the Office, *id.* ¶ 5, and personally directs the content of public communications such as press releases, *id.* ¶¶ 6–7, 60–61, and his official webpage, *id.* ¶ 37. He created the Account in 2009, Doc. 91, ¶ 7; Doc. 91, Add'l Facts ¶ 22, and since that time he has—and continues to—exert "sole authority," over the Account, Doc. 91, ¶ 9. The City recognizes President Reed's final policymaking authority over Office social media; for example, the City Social Media Policy, Doc. 91, Add'l Facts ¶ 8, which "establish[ed] rules for managing the City's official social media sites and accounts" for civil service employees, *id.* ¶ 9, does not apply to public officials such as President Reed or to his staff, *id.* ¶¶ 10–14. President Reed testified he is not bound by this policy, nor does he abide by any other City social media policies. *Id.* ¶ 14–15.

President Reed's Account is an extension of his Office. President Reed has consistently used the Account for official purposes. He created the Account with the handle "@PresReed," referencing his elected office. *Id.* ¶¶ 22–23. He has used it to issue press releases, *id.* ¶¶ 6–7, 60–61, communicate with other government officials about Board of Aldermen (the "Board") issues, *id.* ¶ 52, solicit information from the public, *id.* ¶¶ 54–55, and inform his constituents of official

---

[1] Plaintiff additionally submits her Response to Defendant's Statement of Uncontroverted Facts (Doc. 91), which also includes therein Additional Facts in Response to Defendant's Uncontroverted Statement of Material Facts (hereafter referred to as "Doc. 91, Add'l Facts").

matters, *id.* ¶¶ 47–50, 59. He also announced official acts on the Account, such as creation of a Coronavirus Special Committee, *id.* ¶¶ 47–50, and the introduction of a bill to the Board, *id.* ¶ 51.

President Reed has also harnessed the power and prestige of his Office to bolster the Account. Members of President Reed's staff had access to, assisted in the operation of, and created graphics to be posted on the Account. *See, e.g.*, *id.* ¶¶ 30–36. His staff worked with employees of the City's IT department to ensure that his official webpage contained an embedded live feed of the Account's tweets, *id.* ¶¶ 38–45, and prior to the filing of this suit the Account contained a corresponding link back to the webpage, *id.* ¶ 45. Finally, the Account's bio explicitly labels it as belonging to the "President of the Board of Aldermen." Doc. 91, ¶ 10.

## ARGUMENT

I. ***MONELL* LIABILITY IS ESTABLISHED BECAUSE PRESIDENT REED HAS FINAL POLICYMAKING AUTHORITY OVER THE OFFICE'S USE OF SOCIAL MEDIA**

The City is liable for President Reed's act of blocking Ms. Felts from the interactive portion of the Account because President Reed is the final policymaking authority for the Office's use of social media. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) ("[A]n unconstitutional governmental policy [can] be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business."). Where *Monell* liability rests on an official's final policymaking authority, "[d]istrict courts should consult two sources to identify the final policymaker: '(1) state and local positive law and (2) state and local custom or usage having the force of law,'" *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) (citation omitted), to "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular . . . violation at issue," *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citation omitted); *see also Soltesz*, 847 F.3d at 946 (this inquiry "will always

3

direct the courts to some official or body of officials that has policymaking authority in a given area of the municipality's business"). Both the state's positive law and the City's custom confer President Reed policymaking authority over the Office's operation, including its use of social media.

A municipality is also liable for acts performed by an official who is delegated policymaking authority over an action by the official vested with policymaking authority by law. *See Soltesz*, 847 U.S. at 946–47 (an official "possesses delegated final policymaking authority when that official acts (1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker" (citing *Praprotnik*, 485 U.S. at 127)). President Reed is the final policymaker regarding operation of the Account, as the operation was entirely free of review or constraint by the City. Defendant's Motion must therefore be denied.

### A.   State Law Vests President Reed with Final Policymaking Authority over the Office's Use of Social Media

President Reed has near-plenary power over the Office's affairs. Positive law places President Reed atop the Office's hierarchy, empowering him to hire and fire Office employees at will, Doc. 91, Add'l Facts ¶ 2, and direct the duties of the Office's secretary, *id.* ¶ 3. He is the "ultimate person who has authority over all four employees," *id.* ¶ 18, and does not answer to anyone "within the structure of the City of St. Louis government." *id.* ¶ 4. He is, in short, the "highest official" in the Office, a fact the Eighth Circuit has found instructive in determining the final policymaker within a government department. In *Angarita v. St. Louis Cnty.*, for example, the Eighth Circuit explained that the Superintendent of Police was the "final policymaker" for the St. Louis County Police Department because he was "the highest ranking police official in St. Louis County . . . [and] responsible for the entire department," among other factors. 981 F.2d 1537, 1547 (8th Cir. 1992); *see also id.* at 1548 (finding "direct management supervision over the

4

department was sufficient to be considered final policymaker"); *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (citing *Wellington v. Daniels*, 717 F.2d 932, 936 (4th Cir. 1983) for the proposition that "delegation of law enforcement policymaking authority to police chief assumed").

President Reed's policymaking authority over the Office's use of social media and its communications in general is particularly sweeping. In the area of communications and social media usage, the only "guiding principle[s] or procedure[s]," *Laney v. City of St. Louis*, No. 4:18 CV 1575 CDP, 2019 WL 2423308, at *4 (E.D. Mo. June 10, 2019) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 700 (8th Cir. 2016)), President Reed follows are his own. Since he created the Account in March 2009, Doc. 91, ¶ 7, President Reed has controlled its operation. Doc. 91, ¶ 9. *Compare Ware v. Jackson Cnty.*, 150 F.3d 873, 886 (8th Cir. 1998) (noting that an officer's exclusive control over an area supported a finding of final policymaking authority) *with Schmidt v. City of Bella Vista*, No. 4:06CV265SNL, 2007 WL 9809047, at *10 (E.D. Mo. Aug. 13, 2007) (explaining that because Defendant could not implement policies without "approval from the Mayor and the Board of Aldermen," he was not the final policymaker), *aff'd sub nom. Schmidt v. City of Bella Villa*, 557 F.3d 564 (8th Cir. 2009). President Reed acts unconstrained by any "governmental policies relating to Twitter or social media" in operating the Account. Doc. 91, Add'l Facts ¶¶ 14–15**.** He makes the "decisions about policies about who is . . . authorized to communicate on behalf of the [O]ffice." *id.* ¶ 5. He drafts the Office's press releases. *Id.* ¶¶ 6–7, 60–61. He decides what appears on his official webpage. *id.* ¶ 37. The City's "manager of internet services for the Information Technology Services Agency" confirmed the understanding that the Office—i.e. President Reed—is the final decisionmaker in this area. *See id.* ¶¶ 39–40 (the manager agreeing that the Office has "final decision-mak[ing authority] for the [individualized] content that appears on the Board of Aldermen's President's Office page."); *see also Angarita*, 981 F.2d at

1547 (holding that, among other factors, an official being responsible for "drafting and approving many of the department's general orders" evinced that he was the final policymaking authority).

The Office's exclusion from the City's Social Media Policy is consonant with the fact that President Reed controls the operation of the Office's accounts. Doc. 91, Add'l Facts ¶¶ 8–15; *see also Praprotnik*, 485 U.S. at 122, 125 (holding state law includes such things as "policy statement[s]" and "valid local ordinances and regulations"). The City's Social Media Policy expressly "establish[es] rules for managing the City's official social media sites and accounts," Doc. 91, Add'l Facts ¶ 9, but the rules apply only to civil service employees, not to elected officials such as President Reed and his staff, *id.* ¶¶ 10–15 (President Reed and Mr. Shepard testifying that employees of the Office are not bound by any City social media policies). The Office's exclusion from the Social Media Policy reflects the City's understanding that the Office controls operations of its social media accounts. Therefore, as President Reed controls who is "authorized to communicate on behalf of the [O]ffice," *id.* ¶ 5, he is the final decisionmaker for the Office's use of social media. *See Williams v. Butler*, 863 F.2d 1398, 1400 (8th Cir. 1988) (explaining a municipal judge's "sole authority to discharge his chief clerk or deputy clerks and to determine their working conditions . . . supported by [a Personnel Policies Statement] . . . which exempts municipal court employees" supports the finding that the judge is the final policymaker in that area of city business).

**B.    The City Delegated President Reed Policymaking Authority over the Office's Use of Social Media**

Even assuming state law does not vest President Reed with policymaking authority over the Office's use of social media, the City delegated him authority over this area because he operated the Office's accounts without any "review" or "constraints" by any other government entity. *Soltesz*, 847 F.3d at 946; *see also Atkinson v. City of Mountainview*, 709 F.3d 1201, 1215

6

(8th Cir. 2013) (recognizing delegation of final policymaking authority may occur via custom). President Reed identifies no instances in which the Office's use of social media has been reviewed or constrained. Doc. 91, Add'l Facts ¶¶ 14–15 (when asked to "[i]dentify any governmental policies relating to Twitter or social media that Mr. Reed used or abided by while using [the Account]," President Reed replied "None"); Doc. 91, ¶ 9 ("Reed has sole authority over his Twitter account."). This control over the Account demonstrates the City delegated President Reed final policymaking authority over the Office's social media use. For example, in *Williams v. Butler*, the Court found that a city delegated final policymaking authority to a municipal judge for "employment matters" because (1) his fired employees had no internal avenues of appeal, and (2) the judge's authority was constrained by no other municipal policymaker. 863 F.2d at 1402–03. Similarly, in *Ware*, the Eighth Circuit held that the director of a detention facility had been delegated final policymaking authority in the area of personnel discipline because, even though he was "ultimately [supervised] by the Jackson County Executive," among other factors, (1) there was no "proven mechanism" by which his decisions on personnel discipline were reviewable, and (2) he "exclusively[ly] handl[ed] . . . disciplinary actions." *Ware*, 150 F.3d at 879; *see also Valentino v. Vill. of S. Chicago Heights*, 575 F.3d 664, 678 (7th Cir. 2009) (holding that the mayor was the "the de facto policymaker . . . regard[ing] [] personnel decisions" because the city did not "meaningfully" review his decisions and could point to no laws constraining this authority, and instead had a practice of allowing the mayor to set "whatever hiring/firing criteria he [saw] fit"); *Mandel v. Doe*, 888 F.2d 783, 794 (11th Cir. 1989) (explaining that a physician's assistant was the county's final policymaker regarding medical issues at a certain prison because, even though a policy "initially contemplated that the physician's assistant would be supervised by a medical doctor," his decisions were eventually taken "without any supervision or review at all"); *Spell*, 824

7

F.2d at 1387 ("Delegation may be express . . . or implied from a continued course of knowing acquiescence by the governing body in the exercise of policymaking authority by an agency or official.").

President Reed is not subject to any review or constraint by the City. When asked whether "[w]ithin the structure of the City of St. Louis government, do you answer to anyone?" President Reed testified "No." Doc. 91, Add'l Facts ¶ 4. As in *Williams*, Ms. Felts could not appeal President Reed's decision to block her to any official supervising his operation of the Account. *See Williams*, 863 F.2d at 1402. This lack of constraint and reviewability is made even more explicit by President Reed's exemption from the City's only policy restricting its officials' use of their accounts. Doc. 91, Add'l Facts ¶¶ 8–15.

### C. Defendant Misapplies the *Monell* Analysis by Failing to Focus on the Challenged Unconstitutional Action

Defendant claims that *Monell* liability is analyzed by focusing on whether the formal powers of the official who performed the challenged action are "executive" in nature. Doc. 81 at 10. This analysis, however, avoids the central question—whether the official had final policymaking authority in a *specific* area of the City's business. *McMillian*, 520 U.S. at 785. Defendant's approach not only ignores that Ms. Felts' Complaint is directed toward President Reed's policymaking authority over the *Office's* use of social media, Doc. 91, Add'l Facts, ¶ 19 (explaining the suit was initiated on the basis of "President Reed operat[ing] and oversee[ing] the policy behind the Office of the President of the St. Louis Board of Aldermen's use of the Twitter account '@PresReed'")—and not the Board's or other city officials' use of social media—but also inverts the *Monell* analysis. The starting point for the analysis is the challenged action, not the actor who performed it. And once that action is identified, the proper question is not whether the actor who performed it is an executive. Rather, "[r]eviewing the relevant legal materials . . . the

8

trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737 (citation omitted).

Because Defendant's analysis fails to focus on the challenged action, Defendant vaguely describes the policymaking authority at issue as "special authority regarding policies concerning the First Amendment or social media usage." Doc. 81 at 9. But the question is not whether President Reed had total, "all or nothing," *McMillian*, 520 U.S. at 785, control over these broad categories for the City as a whole—the question is whether President Reed had final authority over the "particular issue" raised by Ms. Felts' suit. *Id.*; *see also*, *Ware* 150 F.3d at 885, 887 (where the challenged action was a prison supervisor's "failure to address" a subordinate's misconduct, the court defined the area of policymaking authority as "the customs of failing to discipline adequately officers engaged in sexual misconduct and failing to investigate allegations of such misconduct" within the specific prison the defendant oversaw). In this case, the action Ms. Felts challenges is President Reed denying her access to one of the Office's social media accounts, Doc. 91, Add'l Facts ¶ 20, and therefore control over the operation of this specific account is the particular issue for which the Court must identify a final policymaker. *McMillan*, 520 U.S. at 785. It makes no more sense to define the area of policymaking authority as encompassing all official City accounts as it would have been for *Ware* to include discipline for all municipal employees. Defining the policymaking authority as the authority to control *all* City social media operation could allow the City to "insulate [itself] from liability for unconstitutional policies" by parceling out authority to run particular accounts. *Praprotnik*, 485 U.S. at 127.

## II. PRESIDENT REED OPERATED THE ACCOUNT UNDER COLOR OF STATE LAW

A claim under 42 U.S.C. § 1983 requires that the government official was acting under color of state law. As this Court has explained, "[a]n action is taken under color of law if it is fairly attributable to a government entity." Doc. 21 at 11 (citing *Meier v. St. Louis*, 934 F.3d 824, 829 (8th Cir. 2019)). The Eighth Circuit has made clear that "[t]he element is satisfied if the defendant acts or purports to act in the performance of official duties." *Johnson v. Phillips*, 664 F.3d 232, 240 (8th Cir. 2011). As this Court has already determined, when administering a social media account, a government official is acting under color of state law when "the page is clothed in the 'power and prestige of [his] state office' and administered 'to perform actual or apparent duties of [the] office.'" Doc. 21 at 11 (quoting *Davison v. Randall*, 912 F.3d 666, 680–81 (4th Cir. 2019)).

Establishing that an act was done under color of state law is a fact-intensive inquiry, one that involves examining the specific circumstance to determine if there is a "close nexus between the State and the challenged action." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Determining what is fairly attributable to the state is "a matter of normative judgment, and the criteria lack rigid simplicity." *Id.* at 295–96. In determining whether the operation of an account is fairly attributable to the state, courts must look at all of the facts surrounding how a social media account was used and administered to see whether it was essentially an "organ of official business." *Campbell v. Reisch*, 986 F.3d 822, 826 (8th Cir. 2021).

The factors examined in cases regarding elected officials' social media accounts, including those cited by Defendant, indicate President Reed's account is official, not personal. The court in *Lindke v. Freed*, for instance, recognized a number of factors relevant to determining the official nature of an account. *Linkdke*, No. 20-10872, 2021 WL 4427170, at *5 (E.D. Mich. Sept. 27, 2021)

10

(cited by Defendant in Doc. 81 at 18). Those included "whether the public official is identified on the page with the public position he or she holds," "whether the public official uses the page to announce official business," "whether the page includes governmental contact information," "whether posts are expressly addressed to constituents," and "the use of government resources, including government employees, to maintain the page." *Id.*; *see also, e.g.*, *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 951 (W.D. Wis. 2019) (identifying similar factors such as a page's "public, not private, purpose," the "use of government resources [and] . . . employees," a connection between official resources and the page and "efforts to 'swathe' the page 'in the trappings of . . . office'") (citing *Davison v. Loudoun Cnty. Bd. of Supervisors*, 267 F. Supp. 3d 702, 712 (E.D. Va. 2017), *aff'd sub nom. Davison v. Randall*, 912 F.3d 666 (4th Cir. 2019)).

Each of these factors indicates that President Reed's Account is official. He used the Account to further his official duties: he communicated with his constituents, Doc. 91, Add'l Facts ¶¶ 28–29, 47–61; he announced policies and activities of his Office, *id.* ¶¶ 49, 51, 53, 59; he solicited feedback from the public and he gave out important health and safety information, *id.* ¶¶ 28, 47, 49, 54, 55, 59. He used City employees and resources to assist him in running the Account. *Id.* ¶¶ 28–40. He "clothed the page in the trappings of [his] public office." *Davison*, 912 F.3d at 683 (quoting *Harris v. Harvey*, 605 F.2d 330, 337 (7th Cir. 1979)). The Account used the handle @PresReed at its inception and for nearly the entirety of its operation prior to the filing of this lawsuit. Doc. 91, Add'l Facts ¶¶ 23–25. President Reed posted letters on the Account addressed from the President of the Board of Aldermen. *Id.* ¶¶ 47–48, 60–61. The Account was listed as a way to contact President Reed, and tweets from the account were displayed on the official City website for President Reed's Office. *Id.* ¶¶ 42–44. All together, these facts establish that the

Account held itself out not as Lewis Reed's private account, but instead the account of the President of the Board of Aldermen.

The Eighth Circuit analyzed a Twitter account run by an elected official in *Campbell v. Reisch* earlier this year. In that case, the court looked at similar factors surrounding the specific Twitter account at issue before determining that the account in that case was "akin to a campaign newsletter." *Campbell*, 986 F.3d at 827. However, President Reed's operation of the Account was far different from that of the state legislator defendant in that case. The legislator, then a private citizen, created her campaign account at the same time that she announced her candidacy for office. *Id*. at 823. President Reed, on the other hand, had already been President of the Board of Aldermen for some years before creating the account, and named the Account, @PresReed, a reference to the elected office he already held. Doc. 91, Add'l Facts ¶ 22. In *Campbell*, the legislator's use of the account was primarily electoral: she "solicited donations to her campaign on the account; and, for over a year, she sought to convince her audience to support her election bid." 986 F.3d at 826. President Reed, on the other hand, frequently used the account to further his role as President of the Board of Aldermen, and President Reed has failed to produce undisputed facts that show it was used predominantly for assisting in his election campaigns. Instead, the activities on the Account are of an elected official representing his official office.

President Reed's duties as President of the Board of Aldermen went beyond merely voting as a member of the Board and included representing his office to the people of St. Louis. President Reed issued press releases, communicated with other government officials about Board issues, solicited information from the public, and informed his constituents of official matters. Doc. 91, Add'l Facts ¶¶ 47–61; *id*. ¶ 55 (President Reed tweeted, for example "[i]f you own a city business or nonprofit or support a city business or nonprofit, we want to hear from you"). President Reed

12

"consistently used the Account as an important tool of governance and executive outreach." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir. 2019), *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (vacated with instructions to dismiss as moot because President Trump had left office).

Furthermore, President Reed's administration of the Account demonstrates that he was not running a campaign newsletter but instead operating a tool of official City communication. President Reed stated that when he was acting for campaign purposes, he would not use City resources. Doc. 91, Add'l Facts ¶ 44. Yet members of President Reed's staff had access to, assisted in the operation of, reviewed the content of tweets for, and created graphics to be posted on the Account. *Id.* ¶¶ 30–36. His staff worked with employees of the City's IT department to ensure that his official City webpage linked to President Reed's Account as a potential way of reaching him, his account linked back to that official webpage, and at the time this suit was filed a live feed of everything he posted from the Account appeared on the webpage for the Office on the City website. *Id.* ¶¶ 37–45. The Account gave every indication that it was official, as it was "clothed . . . in the power and prestige of [Reed's] state office." *Davison*, 912 F.3d at 681 ("A private citizen could not have created and used the . . . Page in such a manner."). Unlike *Campbell*, President Reed's Account wasn't the equivalent of a campaign newsletter, but instead a public relations arm of his office.

President Reed's Account has far more in common with accounts found in other cases to have been operated under color of state law. In particular, President Reed used his account in very similar ways to how President Trump used his in *Knight*. Just as President Trump used his account to announce policy decisions, *Knight*, 928 F.3d at 232, President Reed used the Account to, for example, announce the creation of a Coronavirus Special Committee within the Board and his

13

intention to introduce a bill to the Board, Doc. 91, Add'l Facts ¶¶ 49–50, 51, 53. *See Davison*, 912 F.3d at 666 (finding state action where defendant used social media page to "inform the public about serious public safety events and to keep her constituents abreast of the County's response to a snowstorm and to coordinate snow removal activities"). President Trump used his account "to engage with foreign leaders," *Knight*, 928 F.3d at 236, and President Reed used his account to tweet at other government officials, including a tweet encouraging Governor Parson to send money related to coronavirus aid to St. Louis, Doc. 91, Add'l Facts ¶ 52. Both Trump and President Reed's accounts identified the elected role they had in their Twitter bio, and while Trump explicitly called his page official, President Reed's was linked to and was once displayed on the City's official website. *Knight*, 928 F.3d at 231; Doc. 91, Add'l Facts ¶¶ 42–45. Both officials used their staff to access, advise, and assist in running their accounts. *Knight*, 928 F.3d at 235; Doc. 91, Add'l Facts ¶¶ 30–36. President Reed's Account was operated in a way far more analogous to the account in *Knight*, where the account was ruled official, than in *Campbell*, where it was merely used for campaigning.

President Reed's Account was not merely a campaign newsletter. Instead, the Account appears to be and was operated as an "organ of official business." *Campbell*, 986 F.3d at 826. As such, the actions the Account takes are "fairly attributable" to the state. *Davison*, 912 F.3d at 680. When he administered the Account, President Reed was acting under color of state law.

## **CONCLUSION**

As the President Reed is the final policymaking authority for the Office of the Board of Aldermen of the City of St. Louis, his unconstitutional act of blocking Ms. Felts on Twitter establishes a municipal policy for which the City is liable. Further, President Reed's operation of the Account was one cloaked in the power and prestige of his Office and thus occurred under color

of state law. Defendant's Motion should be denied, and judgment should be entered against Defendant.

DATED: November 10, 2021                    Respectfully Submitted,

s/ Lisa S. Hoppenjans
Lisa S. Hoppenjans, #63890 (MO)
Tobin Raju, #5638523 (NY)
Alida Babcock (law student authorized
  under E.D. Mo. L.R. 12.05)
Charles Clark (law student authorized
  under E.D. Mo. L.R. 12.05)
Andrew Stubbs (law student authorized
  under E.D. Mo. L.R. 12.05)
First Amendment Clinic
Washington University in St. Louis
School of Law
One Brookings Drive
Campus Box 1120
St. Louis, MO 63130
Phone: (314) 935-8980
lhoppenjans@wustl.edu
tobinraju@wustl.edu

Anthony E. Rothert, #44827 (MO)
Jessie Steffan, #64861 (MO)
Molly Carney, #70570 (MO)
Emily R. Lazaroff, #73811 (MO)
ACLU of Missouri Foundation
906 Olive Street, Suite 1130
St. Louis, Missouri 63101
Phone: (314) 669-3420
arothert@aclu-mo.org
jsteffan@aclu-mo.org
mcarney@aclu-mo.org
elazaroff@aclu-mo.org

Gillian R. Wilcox, #61278 (MO)
ACLU of Missouri Foundation
406 West 34th Street, Ste. 420
Kansas City, MO 64111
Phone: (314) 652-3114
gwilcox@aclu-mo.org

**ATTORNEYS FOR PLAINTIFFS**