**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| SARAH FELTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-821-JAR |
| | ) | |
| LEWIS E. REED, | ) | |
| ST. LOUIS BOARD OF ALDERMEN, | ) | |
| PRESIDENT, | ) | |
| | ) | |
| Defendant. | ) | |

## REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant does not dispute any "core material facts," Doc. 89 at 1, but instead offers two legal bases for opposing Plaintiff Sarah Felts' Motion for Summary Judgment. However, because (1) Ms. Felts can establish *Monell* liability, and (2) President Reed acted under color of state law when he blocked Ms. Felts, Defendant's arguments are unavailing. Ms. Felts' motion also seeks appropriate injunctive relief that will protect her First Amendment rights—and the First Amendment rights of her fellow citizens—from irreparable harm. Ms. Felts' Motion for Summary Judgment should be granted.

## I.   PRESIDENT REED IS THE FINAL POLICYMAKER FOR HIS OFFICE'S USE OF SOCIAL MEDIA

### A.   State Law Identifies President Reed as the Final Policymaker

Final policymaker analysis begins by identifying the challenged action, here President Reed blocking Ms. Felts from the @PresReed Twitter account (the "Account"). *See* Doc. 92 at 9. By "[r]eviewing the relevant legal materials," courts "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action . . . ." *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S. 701, 737 (1989) (citation omitted). There

are two sources of relevant legal materials: "(1) state and local positive law and (2) state and local custom or usage having the force of law." *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) (citation omitted). A municipality is also liable for acts by an official who is delegated policymaking authority over the action at issue, which occurs when "that official acts (1) free of review and (2) without any constraints imposed as a matter of policy by the original policymaker." *Id.* These three categories together comprise the "state law" that identifies final policymakers. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.") President Reed asserts—with a citation to *Praprotnik*, a case that does not support the proposition—that courts must also ask whether "the municipality can be said to have effectively enacted a formal policy violative of that right." Doc. 89 at 5; *contra City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (final policymaking authority need not be "authorized by written law or express municipal policy"). He then concludes, based solely on the "power explicitly granted by Charter," that "Mr. Reed does not have 'final policy making authority' for the City on *any* matter." Doc. 89 at 5. First, President Reed's conclusion is factually incorrect; both the City Code, Doc. 91, Add'l Facts ¶¶ 2–3, and Board of Aldermen Rules, Doc. 90 ¶¶ 17–18, vest him with unilateral powers. But more fundamentally, President Reed's undue focus on formality omits a large swath of state law—positive law, local custom, and delegated power—establishing his final policymaking authority for the use of social media by the Office of President of the Board of Aldermen of the City of St. Louis' (the "Office").

Both the City's customs and its positive law vest President Reed with near-plenary power over the affairs of the Office. *Soltesz*, 847 F.3d at 946. The City Code places him atop the Office's

hierarchy, empowering him to hire and fire Office employees at will, Doc. 91, Add'l Facts ¶ 2, and direct the duties of the Office's secretary, *id.* ¶ 3. President Reed further admits that he "has ultimate authority over the four employees in the Office." Doc. 90 ¶ 16. He does not offer any facts to dispute his testimony that he does not "answer to" anyone "within the structure of the City of St. Louis government," Plaintiff's Reply in Support of Plaintiff's Statement of Uncontroverted Material Facts ("Pl. SUMF Reply") ¶ 57.[1] Nor does President Reed dispute his control over the Office's communications, including its use of social media. President Reed admits that he has "the final or ultimate authority to authorize communications" on behalf of the Office. Doc. 90 ¶ 56. Regarding the Account, President Reed created it, Doc. 91 ¶ 7, and controls its operation, *id.* ¶ 9, including decisions about whether to block other accounts, Doc. 90 ¶ 59. The exclusion of President Reed's Office from the City's Social Media Policy recognizes that Reed has control over this area of City business. Pl. SUMF Reply ¶ 55.

President Reed at least wielded delegated final policymaking authority over the Account because he operated it "free of review" and "without any constraints." *Soltesz*, 847 F.3d at 946. He offered as an undisputed fact that he "has sole authority over his Twitter account." Doc. 91 ¶ 9. When asked to "[i]dentify any governmental policies relating to Twitter or social media that Mr. Reed used or abided by while using [the Account]," President Reed replied "None." *Id.* Add'l Facts ¶ 15. More generally, President Reed offers no facts disputing his statement that he answers to no one "within the structure of the City of St. Louis government . . . ." *Id.* Add'l Facts ¶ 4. As a result, Ms. Felts had no way to appeal President Reed's unconstitutional actions short of this suit. *See Ware v. Jackson Cnty.*, 150 F.3d 873, 886 (8th Cir. 1998) (finding that the lack of internal

---

[1] Plaintiff herewith files her motion for leave to file her Reply in Support of Plaintiff's Statement of Uncontroverted Material Facts, with the proposed reply as Exhibit 1 thereto.

avenues to appeal the challenged action supports a finding that the official who took the action was delegated final policymaking authority for that action). President Reed does not and cannot dispute his own statements regarding his delegated authority. Instead, he erroneously implies that delegation is not a part of *Monell* liability. *See* Doc. 89 at 5 (asserting "Mr. Reed does not have 'final policy making authority' for the City on *any* matter" based solely on his "power explicitly granted by Charter").

Because President Reed is the final policymaker for the Office's use of social media, his decision to block Ms. Felts meets the Eighth Circuit's definition of a policy under *Monell*: a "deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Stockley v. Joyce*, 963 F.3d 809, 823 (8th Cir. 2020); *see also Praprotnik*, 485 U.S. at 123 ("[A]n unconstitutional governmental policy [can] be inferred from a [final policymaker's] single decision . . . ."). President Reed, however, appears to claim there was no "*deliberate choice*" where he purportedly had an "in-the-moment reaction." Doc. 89 at 7. But, as the origin of the Eighth Circuit's definition of a policy reveals, nothing prevents an in-the-moment reaction from being a deliberate choice. The definition in *Stockley* stems from a line of Eighth Circuit cases following the Supreme Court's decision in *Pembaur*, which held that "municipal liability under § 1983 attaches where . . . a deliberate choice to follow a course of action is made from among various alternatives." *Pembaur*, 475 U.S. 483–84 (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985) ("'policy' generally implies a course of action consciously chosen from among various alternatives")); *see also Angarita v. St. Louis Cnty.*, 981 F.2d 1537, 1546 (8th Cir. 1992) (citing *Pembaur* for the proposition that "a municipality is liable under Section 1983 for actions directed by an official who establishes governmental policy whether that action is taken only once or repeatedly"). A deliberate choice merely means one made

4

intentionally. President Reed had the alternative choice to allow his constituent to speak in a public forum, but instead chose to block her from doing so "because of his objection to the content of her statement." Doc. 89 at 1.

 He also acted according to a "guiding principle or procedure." President Reed himself claims that he has a "'zero tolerance' stance towards language that," in his judgment, "even hint[s] at violence." Doc. 89 at 15–16. President Reed claims he blocked Ms. Felts pursuant to this guiding principle, doing so not because of a flight of pique but because he interprets the hashtag "Aldergeddon" to "ha[ve] its roots in violent . . . acts," a category of language he finds intolerable. Doc. 90 ¶ 158. And even if President Reed initially acted "in-the-moment" when he blocked Ms. Felts, Doc. 89 at 7, it is undisputed that he blocked her for at least sixteen months, Doc. 90 ¶¶ 119, 125. President Reed could have chosen to stop this deprivation of Ms. Felts' First Amendment rights at any point during this period, but deliberately chose to continue. Doc. 90 ¶ 125.

### B.    President Reed's Cited Cases Illustrate the Broad Sources of "State Law" Relevant to Final Policymaker Analysis

President Reed characterizes a string of Eighth Circuit cases as holding that a "single act by a municipal official was sufficient to establish *Monell* liability" only where "the actor in question had some executive power vested in them by virtue of their office." Doc. 89 at 7. President Reed claims that he, on the other hand, is "not an executive" and therefore cannot "set policy regarding social media that can fairly be said to be the policy of the City itself." *Id.* But if "executive" power simply means the power to create policy within the meaning of *Monell* liability, President Reed's definition begs the question—an executive is a final policymaker and vice-versa. The true test, as the cases President Reed cites makes clear, does not turn on the label "executive." *See generally Praprotnik*, 485 U.S. at 124–25 ("The States have extremely wide latitude in determining the form that local government takes . . . . [O]ne may expect to find a rich variety of

ways in which the power of government is distributed among a host of different officials and official bodies."). Rather, as the cases President Reed cites illustrate, final policymaker analysis requires courts to closely examine the nature of the challenged action and the state law to identify which officials oversee that area of government.

*Granda*, the case collecting the other cases President Reed cites, does not suggest that final policymaking authority turns on whether an individual is an "executive." There, the court considered whether a municipal judge acted as a final policymaker when she issued an order incarcerating the plaintiff. *Granda v. City of St. Louis*, 472 F.3d 565, 566 (8th Cir. 2007). Although the court concluded she was not, its distinction did not rest on the nebulous notion of "executive power"; rather, it cited a string of cases in which a final policymaker's "*actions* were of a different nature than [the municipal judge's]" at issue. *Id.* at 568–69 (emphasis added). Instead, the court held the municipal judge could not be a final policymaker for purposes of "a judicial decision that is subject to review or reversal by higher state courts." *Id.* at 569. The court did not hold that a municipal judge could *never* be a final policymaker. Indeed, *Granda* cites approvingly to *Williams*, wherein the court held a municipal judge—no more an "executive" in the classic sense than President Reed—a final policymaker. *Id.* at 569 (citing *Williams v. Butler*, 863 F.2d 1398 (8th Cir. 1988)). Once again, *Granda* distinguished its facts from *Williams* through the nature of the challenged decision; while a judge is not a final policymaker when he or she makes a reviewable judicial decision, the "administrative decision of a municipal judge to terminate his law clerks" in *Williams* was that of a final policymaker. *Id.*

The other cases President Reed cites—*Ware*, *Angarita*, and *Hollins*—also undermine the notion that "executive" power is a useful distinction, instead illustrating the breadth of sources of state law courts examine to determine final policymaking authority. In *Ware*, the court cited no

6

positive law to support its holding. In fact, the pertinent law stipulated that other officials had the "right to overrule" the final decisionmaker. *Ware*, 150 F.3d at 879. Nevertheless, the court found that because, in practice "the County delegated to [a prison director] its power to establish final employment policy with respect to the discipline of officers," the director was a final policymaker for a decision whether to discipline a particular officer. *Id.* at 880, 86.

In *Angarita*, the court held a police superintendent to be a final policymaker based on his general supervisory authority over a county police department. *See Angarita*, 981 F.2d at 1547 (superintendent "was the highest ranking police official in St. Louis County" and was "responsible for the entire department"); *see also id.* (citing approvingly to *Flanagan v. Munger*, 890 F.2d 1557 (10th Cir. 1989) for the proposition that "Chief of Police found to have direct management supervision over the department was sufficient to be considered final policymaker.").

In *Hollins*, the court held a mayor to be a final policymaker. *Hollins v. Powell*, 773 F.2d 191, 195 (8th Cir. 1985). This determination did not turn on the mayor being an executive: the court asked whether the mayor "had under the governmental structure of the [city] the authority" to carry out the challenged action. *Id.* Nor did the court simply examine the city charter for powers labeled executive, instead finding testimony from the mayor and city police officers regarding the mayor's power sufficient to establish the mayor's policymaking authority. *Id.*

President Reed did not go rogue when he blocked Ms. Felts. He had authority under positive law, established custom, and clear delegation to control operation of the Office, including its social media accounts. His unconstitutional act of blocking Ms. Felts in a designated public forum is attributable to the City.

## II.     PRESIDENT REED ACTED "UNDER COLOR OF LAW" WHEN HE BLOCKED PLAINTIFF FROM THE ACCOUNT

The undisputed facts demonstrate that the Account operated as an official account for the President of the Board of Aldermen, and when President Reed blocked Ms. Felts, such act was under color of law because it was "fairly attributable to a governmental entity." *Meier v. St. Louis*, 934 F.3d 824, 829 (8th Cir. 2019). President Reed does not dispute that the Account operated under the handle @PresReed and identified him as President in the Account's bio. Doc. 90 ¶¶ 44, 49. President Reed does not dispute that the official City webpage for the President of the Board of Aldermen linked to the Account and previously contained a live feed of all its tweets. Doc. 90 ¶¶ 83, 86–87. It is undisputed the feed was embedded after an employee of President Reed's Office requested a City IT employee to do so with Reed's knowledge. Doc. 90 ¶¶ 71, 73. It is undisputed that city employees who were staff members of the Office assisted in the operation of the Account, had direct access to the Account, and made graphics for and assisted with tweets before they were posted. Doc. 90 ¶¶ 62–71. *Cf. Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019) *cert. granted, judgment vacated sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021) (vacated with instructions to dismiss as moot because President Trump had left office) (finding use of government staff to assist with account is evidence that it is official in nature); *One Wisconsin Now v. Kremer*, 354 F. Supp. 3d 940, 951 (W.D. Wis. 2019) (same). President Reed made clear he would not use City resources to do something for a campaign purpose. Doc. 90 ¶ 72.

Furthermore, President Reed used the Account to "further [his] duties as a municipal official." *Davison v. Randall*, 912 F.3d 666, 680 (4th Cir. 2019). President Reed does not dispute he used the Account to communicate with his constituents, Doc. 90 ¶¶ 101, 103, inform the public about health and safety issues in the City, *id*. ¶ 92, and announce his official acts, *id*. ¶¶ 92, 96,

8

106; *see also id.* ¶ 95 (President Reed tweeted "I'm proud to announce the organization of the Coronavirus Special Committee of the #STLBOA."). These actions were all performed in the furtherance of his actual duties as President of the Board of Aldermen, not merely for his "personal pursuits" or campaign purposes. *Campbell v. Reisch*, 986 F.3d 822, 824 (8th Cir. 2021) (citation omitted). That the handle of the Account was changed from @PresReed for a single, six-month period in 2012–13 during one of President Reed's runs for office—out of the approximately 10 years he held the Account prior to this lawsuit—does not change that the Account operated as an official account, including when Ms. Felts' was blocked. Doc. 91, Add'l Facts ¶¶ 23–25.

President Reed incorrectly claims the Account cannot be considered official for the purpose of color of state law because he did "not follow[] the City's policy regarding the creation of 'official' City accounts." Doc. 89 at 10. As an initial matter, President Reed created the Account in 2009, Doc. 90 ¶ 44, far prior to the 2018 implementation of the referenced social media policy, *id.* Add'l Facts ¶ 25; Doc. 90-8. Furthermore, because he is an elected official, President Reed's Office is not subject to the social media policy issued by the Department of Personnel, which governs civil service employees; instead, President Reed controls who is authorized to speak on behalf of the Office and how they should do so. Pl. SUMF Reply ¶¶ 55–56. President Reed cannot claim otherwise now; during discovery, Defendant disavowed reliance on the City social media policy to support any defenses in this litigation by amending Defendant's Rule 26 disclosures to delete a prior reference to City social media policies after Plaintiff's counsel sought clarification on this point. *Id.*   Pl. ¶ 55. Moreover, in response to Plaintiff's request for production of "[d]ocuments relating to or reflecting any policies, practices, rules, regulations, recommendations, or customs applicable to the Office of the President of the St. Louis Board of Aldermen concerning social media activity," Defendant responded: "None." *Id.*

9

In any case, in order for an account to be considered official under the policy, all that is required is that the account was "established with the approval of the appointing authority . . . for the department." Doc. 90 Add'l Facts ¶ 25. As Defendant stated, President Reed is the "appointing authority" for his Office; in creating the Account he clearly did so with his own approval. Doc. 89 at 9. President Reed thus created the Account in a manner consistent with it being an official account under the Department of Personnel policy, even though he was not subject to that policy.

Moreover, whether the City might have considered the Account official does not determine whether it was operated as an "organ of official business." *Campbell v. Reisch*, 986 F.3d 822, 826 (8th Cir. 2021). Courts have consistently looked to the totality of the circumstances surrounding the use of a social media account in determining whether it was official for the purposes of color of state law. *See, e.g.*, *Davison*, 912 F.3d at 680 (account deemed official even though no government policy authorized its creation); *see also, e.g.*, *Knight*, 928 F.3d at 235–36. Regardless of whether the City might have considered the Account official, the Account still operated as a part of the public relations arm of President Reed's office.

The totality of the undisputed facts demonstrate the Account consistently operated as an official account for the President of the Board of Aldermen. Defendant's claim that it was merely personal is undermined by the content of President Reed's tweets, the assistance by city employees with the operation of the Account, the name and appearance of the Account, and the fact that the Account was embedded in President Reed's official city page. The undisputed facts point towards an official account, the actions of which are "fairly attributable" to the state as a matter of law.

## III. PRESIDENT REED'S BLOCKING OF MS. FELTS IS AN ACT OF UNCONSTITUTIONAL VIEWPOINT DISCRIMINATION IN A PUBLIC FORUM

President Reed engaged in an act of unconstitutional viewpoint and content discrimination in a public forum when he blocked Ms. Felts from the interactive component of the Account in

response to her critical question about a local issue. Doc. 87 at 9–13. President Reed does not dispute that he blocked Ms. Felts based on the content of her tweet, *see* Doc. 90 ¶ 128, and makes no attempt to overcome the presumption of unconstitutionality that accompanies viewpoint and content-based restrictions on speech. *See* Doc. 87 at 10, 12. Nor does President Reed claim the content of Ms. Felts' tweet falls within any category of speech that is not fully protected by the First Amendment. *See* Doc. 89 at 15–16. The undisputed facts reflect that Ms. Felts was blocked because President Reed did not like the views she expressed in her tweet, Doc. 90 ¶ 128, and the unrefuted law demonstrates this is unconstitutional viewpoint and content discrimination, *see* Doc. 87 at 12–13.

Contrary to President Reed's claim, the two cited exhibits to Ms. Felts' statement of facts do not undermine her claim of viewpoint discrimination. *See* Doc. 89 at 16. President Reed claims these two exhibits—one of which reflects the very tweet for which he blocked Ms. Felts, as well as one reply to it—reflect that he has not blocked certain other individuals who expressed disagreement with him. *See id.* at 16. There is no evidence that: (1) President Reed saw these other tweets and (2) that he did *not* block these individuals. In addition, the undisputed evidence reflects that President Reed *did* block other individuals because he did not like their views. *See* Doc. 90 ¶¶ 159–60. More fundamentally, the fact that President Reed did not discriminate against *all* individuals who expressed contrary views, even if true, does not undermine Ms. Felts' claim he restricted her speech based on its viewpoint and content.

## IV.      MS. FELTS IS ENTITLED TO INJUNCTIVE RELIEF

Ms. Felts' requested injunctive relief is appropriate because it is narrowly tailored to remedy her irreparable injury and prevents President Reed from continuing to maintain an unconstitutional policy in a designated public forum. Courts have broad equitable powers to craft appropriate injunctive relief. *Brown v. Bd. of Educ.*, 349 U.S. 294, 300 (1955). The Eighth Circuit

notes that "[t]he balance of equities . . . generally favors the constitutionally-protected freedom of expression." *Phelps-Roper v. Nixon*, 545 F.3d 685, 690 (8th Cir. 2008), *overruled on other grounds by Phelps-Roper v. City of Manchester*, 697 F.3d 678, 692 (8th Cir. 2012) (en banc).

A permanent injunction is appropriate when the movant shows: (1) actual success on the merits; (2) irreparable harm; (3) the movant's harm outweighs the harm to the opposing party if the injunction is granted; and (4) the injunctive relief serves the public interest. *See Lowry ex rel. Crow v. Watson Chapel Sch. Dist.*, 540 F.3d 752, 762 (8th Cir. 2008); *Free & Fair Election Fund v. Mo. Ethics Comm'n*, 252 F. Supp. 3d 723, 737 (W.D. Mo. 2017), *aff'd*, 903 F.3d 759 (8th Cir. 2018) (noting "[t]he standard for issuing a preliminary or permanent injunction is essentially the same," except "a permanent injunction requires the [movant] to show actual success on the merits, rather than the fair chance of prevailing on the merits required for a preliminary injunction"). For the reasons stated above and in Ms. Felts' memorandum in support of her motion for summary judgment, she is entitled to judgment on the merits in her favor, satisfying the first prong. Ms. Felts also fulfils the second prong because the loss of her First Amendment rights constitutes irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury"). Finally, as explained below, the balance of harms and public interest weigh in favor of an injunction because the relief is narrowly tailored, and it "is always in the public interest to protect constitutional rights." *Phelps-Roper v. Nixon*, 545 F.3d at 690.

### A.      The Request that All Users Be Unblocked Serves the Public Interest and Is Narrowly Tailored By Incorporating an Exception for "True Threats"

Ms. Felts requests that all individuals be unblocked from the Account because President Reed intends to continue to employ a viewpoint-discriminatory policy in a public forum. *See* Doc. 89 at 15-16. This permanent injunction serves the public interest because this unconstitutional

policy affects not just Ms. Felts, but all others who express views President Reed finds disagreeable. The Eighth Circuit has long recognized the powerful public interest in protecting constitutional rights. *Phelps-Roper v. Nixon*, 545 F.3d at 690. Further, the Eighth Circuit has explained that injunctions must remedy unconstitutional *violations*, including those that impact individuals other than the plaintiff. For example, the Eighth Circuit found a district court's injunction requiring defendants to avoid unconstitutional activity around the plaintiff did "not cure the constitutional violation because it continue[d] to allow the defendants to engage in [the unconstitutional] conduct . . . so long as [Plaintiff] is not present." *Warnock v. Archer*, 380 F.3d 1076, 1081–82 (8th Cir. 2004) ("remand[ing] the case with instructions to modify the injunction to preclude prayers at mandatory meetings regardless of whether [Plaintiff was] present."). *See also Make Liberty Win v. Ziegler*, 499 F. Supp. 3d 635, 642, 646 (W.D. Mo. 2020) (explaining because "[t]he public has a compelling interest in protecting First Amendment rights," a permanent statewide injunction was warranted, even though only a small class of plaintiffs brought suit (quoting *Rodgers*, 942 F.3d at 458)). Ms. Felts' request serves the public interest in the same way.

As the balance of equities favors free expression, President Reed's potential inconvenience in unblocking all individuals simply cannot outweigh the public interest at stake. Further, the injunction allows for the blocking of individuals who use "true threats." Doc. 75 at 2.

**B.    Ms. Felts' Requested Relief Applies Only to Accounts Operated Using City Resources and Only to Acts by the President of the Board of Aldermen and Those Acting on Behalf of the Office**

In the second request, Ms. Felts asks the court to prohibit the President of the Board of Aldermen and those acting on behalf of the Office from altering or restricting users' access to the interactive component (the public forum) of any official account supported by the City of St. Louis. This relief is subject to the true threat exception, Doc. 75 at 2, and targeted only towards accounts that operate with the City's resources, *see supra* Section II. It does not extend to any account

13

operated by an employee or agent of the Office of the President of the Board of Aldermen *without* using City resources. Under this restriction, when President Reed leaves office, and the Account thus no longer receives City resources, it will no longer be covered by the injunction. The relief requested is narrowly tailored *only* to target official accounts, and furthers the public interest by ensuring individuals have the right to access City-created public forums free from viewpoint discrimination. *See, e.g.*, *Warnock,* 380 F.3d at 1081–82.

### C.     The Reporting Requirement is Narrowly Tailored

Defendant misunderstands the scope of the third request. Doc. 89 at 15. It provides an exception to the injunctive relief requested above by allowing "anyone acting on behalf of the Office . . . to block any user who posts a true threat as a tweet in reply to a tweet by *the Account* or who that tags *the Account* in a true threat" as long as "*Defendant* . . . provides to Plaintiff's counsel [with quarterly reports] listing all users so blocked and the text of the" purported true threat. Doc. 75 at 2 (emphasis added). The request mentions only the Account—the "Twitter account with the account identifier 27172787." *Id.* at 1. This narrowly tailored request applies to users blocked by a single specific account—not, as Defendant asserts, to "all persons blocked by the President of the Board of Aldermen" generally. Doc. 89 at 15. And because it applies only to blocking by the President of the Board of Aldermen or those acting on behalf of the Office based on true threats in replies to or tweets tagging the Account, it will presumably cease to have any application once President Reed no longer holds the Office. Moreover, President Reed is sued in his official capacity, meaning the City is responsible for producing the reports, not President Reed in his individual capacity. President Reed's desire to manage a public, official Account in a viewpoint-discriminatory manner does not outweigh the inconvenience to the City of providing reports.

14

Further, Defendant's concern about providing reports to Plaintiff's counsel are overstated. Injunctive relief may include mechanisms to monitor compliance. *See, e.g.*, *Alexander v. Nat'l Farmers' Org.*, 645 F. Supp. 1146, 1151 (W.D. Mo. 1986) (requiring defendants to file with the court annual reports setting forth the steps they have taken to comply with the injunction and serve copies on the opposing party); *Chandler v. Siegelman,* 230 F.3d 1313, 1317 n.5 (11th Cir. 2000) (affirming the appointment of a district-court appointed monitor to ensure compliance with a permanent injunction regarding a violation of Establishment Clause); *see also Gen. Bldg. Contractors Ass'n. v. Pennsylvania*, 458 U.S. 375, 405 (1982) (O'Connor, J., concurring in judgment) (explaining that the mandating of quarterly reports to monitor compliance with an injunction "could be ordered under the court's equitable powers."). Thus, Ms. Felts' narrowly tailored requested relief should be granted, as all requested relief weighs in favor of the public interest, as well as minimally burdens the Defendant.

<u>**CONCLUSION**</u>

For the foregoing reasons, Ms. Felts respectfully requests that this Court grant her summary judgment.

DATED: November 23, 2021                    Respectfully Submitted,

                                            s/ Lisa S. Hoppenjans
                                            Lisa S. Hoppenjans, #63890 (MO)
                                            Tobin Raju, #5638523 (NY)
                                            Alida Babcock (law student authorized
                                                under E.D. Mo. L.R. 12.05)
                                            Charles Clark (law student authorized
                                                under E.D. Mo. L.R. 12.05)
                                            Andrew Stubbs (law student authorized
                                                under E.D. Mo. L.R. 12.05)
                                            First Amendment Clinic
                                            Washington University in St. Louis
                                            School of Law
                                            One Brookings Drive
                                            Campus Box 1120
                                            St. Louis, MO 63130
                                            Phone: (314) 935-8980
                                            lhoppenjans@wustl.edu
                                            tobinraju@wustl.edu

                                            Anthony E. Rothert, #44827 (MO)
                                            Jessie Steffan, #64861 (MO)
                                            Molly Carney, #70570 (MO)
                                            Emily R. Lazaroff, #73811 (MO)
                                            ACLU of Missouri Foundation
                                            906 Olive Street, Suite 1130
                                            St. Louis, Missouri 63101
                                            Phone: (314) 669-3420
                                            arothert@aclu-mo.org
                                            jsteffan@aclu-mo.org
                                            mcarney@aclu-mo.org
                                            elazaroff@aclu-mo.org

                                            Gillian R. Wilcox, #61278 (MO)
                                            ACLU of Missouri Foundation
                                            406 West 34th Street, Ste. 420
                                            Kansas City, MO 64111
                                            Phone: (314) 652-3114
                                            gwilcox@aclu-mo.org

                                            **ATTORNEYS FOR PLAINTIFF**