UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| SARAH FELTS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:20-cv-00821 JAR |
| | ) |
| LEWIS REED, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff Sarah Felts' Motion for Summary Judgment (Doc. No. 75) and Defendant Lewis Reed's Motion for Summary Judgment. (Doc. No. 79). The motions have been fully briefed and are ready for disposition. Plaintiff raises one claim against Reed in his official capacity pursuant to 42 U.S.C. § 1983, alleging he violated her First and Fourteenth Amendment rights by blocking her on Twitter.

**I.   Background**

Defendant Lewis Reed is the President of the Board of Aldermen for the City of St. Louis (the "City"). He was first elected President of the Board of Aldermen in 2007 and has held the position since then. In 2009, Reed created a Twitter account with the handle "@PresReed" (the "Account"). Plaintiff is a resident of the City and one of Reed's constituents. She operates a Twitter account with the handle "@SarahFelts." Twitter is a social media platform that allows users to publish short messages called "tweets." Twitter allows users to repost ("retweet") and respond to tweets posted by users with public profiles, including many government officials. Twitter users can also respond to and interact with other users in relation to such public tweets. Twitter users can choose to make their page either public or private. A private profile is one in

which a user restricts access to their page to only those other users they specifically approve. A public profile is one that can be accessed by any user who has not been "blocked" by the page's owner. Reed has a public Twitter profile, so anyone, except users he has blocked, may view his tweets, interact with his tweets directly, and interact with tweets by other users made in response to his tweets. If a person is blocked by Reed, they may no longer view or interact with his tweets from their Twitter account, although they may still view his tweets through another account.

On January 26, 2019, Plaintiff responded to a tweet regarding efforts to close the St. Louis Workhouse, a Medium Security Institution and one of the two jails in the City: "What do you mean by 'change the messaging around #CloseTheWorkhouse,' @PresReed? #STLBOA #aldergeddon2019 #WokeVoterSTL." (Plaintiff's Statement of Uncontroverted Material Facts ("Plaintiff's SUMF"), Doc. No. 77 at ¶ 118). Plaintiff tagged the Account in her tweet. Reed then blocked Plaintiff's Twitter account because of her tweet. *Id*. at ¶¶ 119, 128.

Plaintiff claims Reed uses the Account to interact with constituents and government officials in his official capacity as the President of the Board of Aldermen. The Account's biography reads: "Father of 4 great kids, husband, public servant, life long democrat, proud St. Louis City resident, President of the Board of Aldermen." (Defendant's Statement of Uncontroverted Material Facts ("Defendant's SUMF"), Doc. No. 80 at ¶ 10). Examples of tweets sent from the Account include images of letters sent to various City officials from the Office of the President of the Board of Aldermen (Plaintiff's SUMF at ¶¶ 91-94), a tweet announcing the President of the Board of Aldermen's Office had created a Coronavirus special committee, *id*. at ¶ 95, a tweet tagging Missouri Governor Mike Parson and asking him to send funds to the City, *id*. at ¶ 97, and tweets encouraging members of the public to participate in the Board of Aldermen's hearings. *Id*. at ¶¶ 99-100.

The Office of the President of the Board of Aldermen (the "Office of the President") has four employees: Maurice Falls, Mary Cullins, Mary Goodman, and Thomas Shepard. *Id*. at ¶¶ 6-7. Reed has ultimate authority over these employees. *Id*. at ¶ 16. Mr. Shepard also volunteers for Mr. Reed's campaigns. (Doc No. 90 at 12). Ms. Goodman and Mr. Shepard have the login credentials for the Account, and they both review Reed's tweets, advise Reed about the messages he sends on Twitter, and post tweets from the Account. (Plaintiff's SUMF at ¶¶ 62, 64-69). Reed also has members of his staff create graphics that he posts to Twitter. *Id*. at ¶ 70.

In April of 2019, Ms. Goodman requested the City IT Department set up an official webpage for the President's Office and include a live feed of the Account on the webpage. *Id*. at ¶ 71. The IT department created the President's Office webpage, which is part of the City of St. Louis' official website. *Id*. at ¶¶ 78, 81. A live feed of the Account appeared on the page until June 12, 2020. *Id*. at ¶¶ 83-84. The President's Office webpage and President Reed's profile on the City of St. Louis' website both link to the Account. *Id*. at ¶¶ 86-87. Until December of 2020, the Account also included a link directing users to the President's Office webpage. *Id*. at ¶ 90.

Reed claims he uses Twitter for campaign purposes, as well as to communicate with friends, family, and the media. (Defendant's SUMF at ¶ 12). In addition to a Twitter account, Reed operates an account on NextDoor, which he uses to communicate with his constituents in his capacity as President of the Board of Aldermen. *Id*. at ¶ 14. Reed's profile picture on his Twitter account is an image taken in connection with, and paid for by, his campaign for mayor. *Id*. at 15. Reed does not use Twitter to hire or fire staff, introduce bills, submit comments, vote in the Board of Aldermen, or issue directives to his staff. *Id*. at ¶¶ 16-20.

Reed claims the City Department of Personnel sets social media policy for the President's Office. The Department of Personnel issued a revised Social Media Policy in May of 2020. (Doc.

3

No. 91 at 8). The policy "establishes rules for managing the City's official social media sites and accounts," *id*., and the procedure for establishing such an account. (Doc. No. 90 at 38). Reed claims the Account was not established pursuant to the Social Media Policy and as such cannot be an official account. Both Reed and Mr. Shepard testified at their depositions that the President of the Board of Aldermen and his employees are not bound by Department of Personnel policies because they are not civil service employees. (Doc. No. 91 at 13).

## II.     Legal Standard

Summary judgment is appropriate when no genuine issue of material fact exists in the case and the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The initial burden is placed on the moving party. *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the record demonstrates that no genuine issue of fact is in dispute, the burden then shifts to the non-moving party, who must set forth affirmative evidence and specific facts showing a genuine dispute on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In determining whether summary judgment is appropriate in a particular case, the evidence must be viewed in the light most favorable to the nonmoving party. *Osborn v. E.F. Hutton & Co., Inc.*, 853 F.2d 616, 619 (8th Cir. 1988). When both parties move for summary judgment, the Court must analyze each motion individually and on its own merits. *Wermager v. Cormorant Township Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983).

## III.    Reed's Motion for Summary Judgment

Reed raises two arguments in support of his motion for summary judgment. First, he claims that Plaintiff cannot establish municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, (1978), and as such judgment must be entered in his favor. Second, Reed argues he is

4

entitled to summary judgment because Plaintiff has not shown he operated the Account under color of law.

### *Monell* Liability

A municipality or local government may be sued directly under § 1983 when that local government implements an unconstitutional policy or custom. *Monell*, 436 U.S. at 694. However, a municipality may not be sued under § 1983 for injuries inflicted solely by its employees or agents. *Id*. Rather, a plaintiff must plead that his injury was caused by "the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Id*. Such a showing ultimately requires proof of either an official municipal policy or misconduct so pervasive among non-policymaking employees of the municipality as to constitute a custom or deliberate indifference to individuals' federal rights. *Ware v. Jackson Cty., Mo.*, 150 F.3d 873, 880 (8th Cir. 1998). Although rare, a public official's single incident of unconstitutional activity can also establish the requisite municipal policy or custom, so long as the decision is made by the highest officials responsible for setting policy in that area of the government's business. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality); *Rynders v. Williams*, 650 F.3d 1188, 1195 (8th Cir. 2011). It is not necessary that the decision-maker intended that the decision apply to a wide range of situations; rather, even a single decision tailored to a particular situation may qualify as an official government policy for purposes of establishing municipal liability under § 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (plurality).

Plaintiff alleges Reed violated her rights in his official capacity, not his personal capacity, and she does not allege that Reed—or the City of St. Louis—has a history of blocking constituents on social media. As such, Reed may only be liable if he is the "highest official[]

5

responsible for setting policy in that area of the government's business," *Praprotnik*, 485 U.S. at 123, or if Reed was delegated policymaking authority over the action at issue. *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017). Reed contends that his actions cannot be attributed to the City because the Department of Personnel is the entity responsible for setting the City's social media policy and Reed has not been delegated authority by the department. Plaintiff argues the relevant area of the government's business is the use of social media in the President of the Board of Aldermen's office—not social media policy for the entire City. She claims Reed, by virtue of his position, is the highest official responsible for setting that policy and, in the alternative, he has been delegated the authority to set social media policy.

"[T]he identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge," *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737 (1989). As such, the Court must determine who the final policymaker in the relevant area of the City's business is. Plaintiff's complaint alleges her First Amendment rights were violated by the operation of the President's Office's Twitter account. Therefore, the relevant question is which official or entity had final policymaking authority over the use of social media by the President's Office, not the City as a whole. "To determine whether a government official serves as the final policymaker, we consult two sources: (1) 'state and local positive law' and (2) state and local 'custom or usage having the force of law.'" *Atkinson v. City of Mountain View, Mo.*, 709 F.3d 1201, 1215 (8th Cir. 2013) (quoting *Jett*, 491 U.S. at 737).

Reed claims the Department of Personnel has final policymaking authority over the President's Office's use of social media. The Department of Personnel released a Social Media Policy, which "establish[es] rules for managing the City's official social media sites" and the policy applies to "the use of social media when speaking or posting materials, information or

6

comments on any social media or social network on behalf of the City, a City department, division, agency ('department') or any City official or appointing authority." (Doc. No. 91-3 at 2-3). Plaintiff contends neither Reed nor anyone in his office were bound by the social media policy, as Reed is an elected official and the other employees in his office are not civil service employees. (Doc. No. 91-4 at 8). Instead, Reed, as President of the Board of Aldermen, is empowered under Missouri law to set the Office's social media policy. Reed himself, as well as his Special Assistant Thomas Shepard, testified during their depositions that they are not bound by the Social Media Policy established by the Department of Personnel. (Doc. No. 91 at ¶ 14). Reed further testified that he does not answer to anyone in the structure of the City of St. Louis government and is not subject to any policies issued by the Director of Personnel. (Doc. No. 91-2 at 5-6).

Although the Eighth Circuit has not determined when a municipality is subject to liability for the action of a local official operating a social media account, other circuits have considered the question. The Fourth Circuit concluded in *Davison v. Randall* that the district court did not commit reversible error in finding Randall, chair of the Loudoun County Board of Supervisors, could not be held liable in her official capacity for blocking a constituent on a Facebook page—although she was liable in her personal capacity. *Davison v. Randall*, 912 F.3d 666, 689-90 (4th Cir. 2019), *as amended* (Jan. 9, 2019). The court noted "the Loudoun Board retained authority to establish municipal policy with respect to social media pages, as it adopted a social media policy governing the County's official social media pages." *Id*. at 689. Furthermore, the plaintiff did not show that the Loudoun Board had delegated final policymaking authority to Chair Randall because the plaintiff did not identify "evidence that the Loudoun Board knew of the Chair's

7

Facebook Page, let alone that it acquiesced in [defendant]'s administration of the page…." *Id*. at 690 (internal quotation omitted).

The Fifth Circuit reached the opposite conclusion in *Robinson v. Hunt Cty., Texas*, 921 F.3d 440, 448–49 (5th Cir. 2019). The court found the defendant, Sheriff Meeks, had final policymaking authority over the Sherriff's Office Facebook page. The county could be held liable for the sheriff's operation of the Facebook page because "[t]he decision to create a Facebook page falls squarely within the sheriff's power," and the authority over the page "derives from his elected position, not by virtue of delegation…." *Id*. at 448-49 (internal quotation omitted).

Reed argues the Department of Personnel is the actual final policymaker, and as such the President of the Board of Aldermen is bound to follow the Department of Personnel's regulations about if and how his office may communicate via social media. The *Davison* court reached a similar conclusion. There are notable differences between the social media policy at issue here and the one at issue in *Davison*. The social media policy in *Davison* was established by the Board and bound the Board's members, while the social media policy at issue here was established by the Department of Personnel[1] and does not apply to the President's Office.

Reed has cited to no authority in support of his proposition that the Department may direct the President's Office's use of social media—or any form of communication—nor can the Court find any such authority. Neither the City Charter or the City Code require the President to report to other city officials or departments. Moreover, the Account was established in 2009, well before the Department of Personnel issued its social media policy.

---

[1] The Department of Personnel consists of a director and commission appointed by the Mayor—not the Board of Aldermen.

The record before the Court indicates the President of the Board of Aldermen, not the Department of Personnel, is the final policymaker with respect to the President's social media. Reed testified that he does not answer to anyone in the St. Louis City government on any matter, including social media and communications, and the Department of Personnel's policies do not apply to him. When Plaintiff requested production of "[d]ocuments relating to or reflecting any policies, practices, rules, regulations, recommendations, or customs applying to the Office of the President of the St. Louis Board of Aldermen concerning social media activity," Reed responded "None." (Pl. SUMF reply ¶ 55). Moreover, Reed admits that he does operate a social media account in his capacity as President of the Board of Aldermen: "Reed prefers to use the social media site 'NextDoor' to communicate with his constituents in the City *in his capacity as President of the Board*." (Doc. No. 89 at 11) (emphasis added). Reed is the highest official in his office and his authority over the President's Office's social media "derives from his elected position…." *Robinson*, 921 F.3d at 449. He is the final policymaker with respect to the President's Office social media.

**Action under Color of Law**

Reed claims he operated the Account as a campaign account, not as an official account, and as such he was not acting under color of law when he blocked Plaintiff. "The essential elements of a § 1983 claim are (1) that the defendant(s) acted under color of state law, and (2) that the alleged wrongful conduct deprived the plaintiff of a constitutionally protected federal right." *Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) (citing *DuBose v. Kelly*, 187 F.3d 999, 1002 (8th Cir. 1999)). Thus if the Account was not operated under color of law, Reed is entitled to summary judgment. "It is not enough that the defendant is a public official, because acts that public officials take in 'the ambit of their personal pursuits,'" such as running

9

for elected office, are not actions taken under color of law. *Campbell v. Reisch*, 986 F.3d 822, 824 (8th Cir. 2021) (quoting *Magee v. Trs. of Hamline Univ.*, 747 F.3d 532, 535 (8th Cir. 2014)). There remains a material question of fact as to whether the Account was operated under color of law, and as such summary judgment is not appropriate.

The Eighth Circuit examined whether an elected official acts under color of law in operating a social media account in *Campbell*. Mike Campbell sued his state representative, Cheri Reisch pursuant to § 1983 for a violation of his First Amendment Rights after she blocked him on her Twitter account. Representative Reisch created her account the day before she announced that she was running for office. Both before and after she was elected, the overall theme of her posts was her suitability for office. Following a bench trial, the district court concluded Representative Reisch had violated Campbell's rights. *Campbell v. Reisch*, No. 2:18-CV-4129-BCW, 2019 WL 3856591, at *1 (W.D. Mo. Aug. 16, 2019). The Eighth Circuit reversed, finding the account was not operated under color of law because it is a campaign account and "[r]unning for public office is not state action; it is a private activity." *Id*. at 825.

The Eighth Circuit contrasted the opinions reached by other circuit courts in *Trump* and *Davison* in reaching its conclusion. In *Trump*, President Trump blocked a constituent from the "@Potus" Twitter Account. *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 235 (2d Cir. 2019).[2] The National Archives and Records Administration found tweets from the account are official records. *Id*. at 235. President Trump used his staff to both post tweets and maintain the account. *Id*. He used the account to announce foreign policy decisions and

---

[2] This decision was vacated by the Supreme Court as moot. *See Biden v. Knight First Amend. Inst. At Columbia Univ.*, 141 S. Ct. 1220, (2021). However, as the 8th Circuit discusses the case at length in *Campbell*, the Court will summarize it here.

initiatives and engage with foreign leaders. *Id*. at 236. Both the President "and his subordinates hold out and use a social media account open to the public as an official account for conducting official business. That account has interactive features open to the public, making public interaction a prominent feature of the account. These factors mean that the account is not private." *Id*. at 236.

In *Davison*, Chair of the Loudoun Board of Supervisors Phyllis Randall blocked a constituent from a Facebook page titled "Chair Phyllis J. Randall," and designated "government official." 912 F.3d at 673. Chair Randall's posts were directed to "Loudoun," and dealt with aspects of her official responsibilities, such as informing constituents about Board meetings. *Id*. Chair Randall also used the page to coordinate the county's response to a snowstorm. *Id*. The page was publicized in an official newsletter, prepared by County employees and hosted on the County's website. *Id*. at 675. The court concluded Chair Randall acted under color of law in operating the Facebook page, noting "[a] private citizen could not have created and used the Chair's Facebook Page in such a manner." *Id*. at 681.

The Eighth Circuit considered two standards it could apply in determining whether an elected official's social media account was operated under color of law. Representative Reisch claimed "a public employee acts under color of law when she exercises power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Campbell*, 986 F.3d at 825 (quoting *Magee*, 747 F.3d at 535). Under this standard, Reisch argued blocking a person on Twitter could not be action under the color of law because "[a]nyone…can block someone on Twitter…." *Id*. Campbell argued that "actions need only be 'fairly attributable' to the State," to be actions under color of law, an approach endorsed in two

11

other circuit court opinions. *Id*. (citing *Trump*, 928 F.3d at 235–36; *Davison*, 912 F.3d at 679–80).

The Eighth Circuit did not determine what standard applied, as Representative Reisch did not act under color of law even under the standard endorsed by the *Trump* and *Davison* courts. Under that standard, it appears that Reed would prevail, as it would foreclose the possibility of a public employee operating a social media account under color of law even if the account was unquestionably an official account used to conduct official business. The Court is not inclined to follow that standard, as the Eighth Circuit has held that a public official may act under color of law even when undertaking an activity that he could also undertake as a private citizen. *See Dossett v. First State Bank*, 399 F.3d 940, 949 (8th Cir. 2005). (Although "exhortations or agreements by a bank customer who also happens to be a school official do not necessarily constitute actions under color of law…the mere fact that a school official also has a personal account at the Bank does not mean that the official's interactions with the Bank are exempt from scrutiny under § 1983.") Instead, an official acts under color of law "if the defendant acts or purports to act in the performance of official duties, even if he oversteps his authority and misuses his power." *Johnson v. Phillips*, 664 F.3d 232, 240 (8th Cir. 2011).

Summary judgment is not appropriate, as "there is sufficient evidence from which a [factfinder] in this civil case could find that [Plaintiff] has proved the 'color of law' element of her claim." *Id*. at 239. Likewise, a factfinder could conclude Reed was acting in his personal capacity. The Court notes that the procedural posture of this matter differs from *Campbell*, *Trump*, and *Davison*. The district court reached its conclusion in *Campbell* after a bench trial, and as such was entitled to make determinations of fact. *See Best Buy Co., Inc. v. Fedders North America, Inc.*, 202 F.3d 1004, 1008 (8th Cir. 2000). Likewise, there was no factual dispute in

12

*Davison* or *Knight*. The district court entered judgment in Davison's favor after a bench trial. 912 F.3d at 676-77.  The district court in *Knight* resolved the case on stipulated facts. 928 F.3d at 230 n.1.

This matter is before the Court on the parties' motions for summary judgment, and as such it can only determine that Reed acted under color of law if "there is no genuine dispute as to any material fact…." *See* Fed. R. Civ. P.  56(a). For the reasons set forth below, the Court concludes that it cannot determine at this point whether Reed operated the Account under color of law. There remains a genuine dispute of fact as to whether the Account was operated as a campaign account. Furthermore, the Court cannot determine at this point to what extend the President's Office staff and other city resources were used to support the Account.

Reed's operation of the Account falls somewhere between Representative Reisch's use of her account as a tool of her political campaign and President Trump's use of his account for official purposes. The Court will first consider the "trappings" of the Account—the way the account is presented. *See Campbell*, 986 F.3d at 827. Next, the Court will examine the content of the messages posted by Reed—his use of the Account. Finally, the Court will consider the extent to which the Account is supported by governmental resources.

Reed started his account in 2009, two years after he was first elected President of the Board of Aldermen. The Account contains some of the official "trappings" recognized by the *Trump* and *Davison* courts. Reed's biography reads "Father of 4 great kids, husband, public servant, life long democrat, proud St. Louis City resident, President of the Board of Aldermen," and the handle was "@PresReed" at the time he blocked Plaintiff on Twitter and at the time this lawsuit was filed. These factors are indeterminate, as they are just as indicative of a political candidate's account as an official government account. *See Campbell*, 986 F.3d at 827. Reed

13

does at times present himself as a candidate for office through the Account. He has twice changed his account handle to denote his candidacy for mayor.[3] The profile picture currently associated with the account is a photograph taken in connection with, and paid for by, Reed's campaign for mayor. These factors are likewise inconclusive, as "the essential character of a Twitter account is [not] fixed forever." *Id*.

Next, the Court will consider whether Reed used his account for political or personal purposes. Reed claims he never conducted official government activity through the Account, and instead used it to "emphasize [his] suitability for public office." *Campbell*, 986 F.3d at 827. In determining Representative Reisch's Twitter account was a private campaign account, the Eighth Circuit noted that, unlike the accounts in *Trump* and *Davison,* no official government activity was conducted through Representative Reisch's account. *Id*. Representative Reisch's tweets were often focused on her suitability for public office, such as providing information on her political party's events, images of her posing with children, and stating her niece would vote for a particular political candidate. *Id*. "Even if Reisch's official duties as a representative extend beyond voting or participating in committee meetings and include things like communicating with constituents about legislation, her sporadic engagement in these activities does not overshadow what we believe was quite clearly an effort to emphasize her suitability for public office." *Id*.

The content posted by this Account is somewhere between the official accounts in *Trump* and *Davison* and Representative Resich's campaign account. Reed never used Twitter to hire or

---

[3]   Reed changed the handle of his Twitter account three times, once from October 3, 2012 to April 7, 2013 and once after this lawsuit was filed, from December 2, 2020 to March 3, 2021 to "@Reed4Mayor." After March 3, 2021, Reed changed the handle to "@LewisReedSTL." (Plaintiff's response to SUMF ¶ 11, Doc. No. 91).

fire staff members or issue orders or directives to his staff. (Reed SUMF at ¶¶ 16, 21).The record before the Court is bereft of examples of the type of campaign activities described in *Campbell*. Reed repeatedly tweeted statements from the "Office of the President of the Board of Aldermen." (Doc. No. 91 at ¶ 21). He used Twitter to announce initiatives of the President's Office, such as a Coronavirus special committee. *Id*. at ¶ 49. Reed further used the Account to encourage members of the public to participate in matters before the Board of Aldermen. *Id*. at ¶¶ 54-55. Based on the record before the Court, Reed's communication about the official duties of his office was far from a "sporadic" or secondary purpose—instead it appears to be a focus of the Account.

The Court will turn to the use of governmental resources to support the Account. In both *Trump* and *Davison*, the social media accounts were supported by governmental resources. In *Trump*, members of President Trump's staff had access to the login credentials and assisted in drafting and posting to his account. In *Davison*, Chair Randall's Facebook page was sent out through the County's official newsletter and was accessible through the County's webpage.

Reed appears to have used some resources of both the City and the President's Office to support the Account. Both Mr. Shepard and Ms. Goodman, employees of the President's Office, had the login credentials to the Account, although Mr. Shepard was also a campaign volunteer. (Doc. No. 91 at ¶ 30). At times, Reed's senior campaign staff also had access to the Account. Reed would request his employees advise him on and review the Account's tweets before they were posted. *Id*. at ¶¶ 31-35. The President's Office staff creates graphics to accompany the Account's tweets. *Id*. at ¶ 36. A President's Office employee, at Reed's request, asked the City IT Department to set up a webpage for the President's Office and to include an embedded live feed of the Account on the webpage. *Id*. at ¶ 38. The City webpage for the President's Office

included this live feed until June 12, 2020. *Id*. at ¶ 43. Reed's profile on the City website linked to the Account and the Account included a link directing visitors to the President's Office webpage until December of 2020. *Id*. at ¶¶ 44, 45.

Based on this record, a factfinder could conclude that Reed "exercised power possessed by virtue of state law and made possible only because [he] is clothed with the authority of state law." *Magee*, 747 F.3d at 535. However, considering the trappings, content, and resources expended in support of the Account, a factfinder could conclude that, at the time Reed blocked Plaintiff, his use of the account was for personal purposes. Plaintiff has shown that Reed used some governmental resources to support the Account. There remain genuine factual disputes as to the extent the Account was supported by these resources. Reed claims Mr. Shepard assisted with the Account in his capacity as a volunteer for Reed's campaign. Moreover, it is unclear whether members of Reed's staff created graphics for the Account as employees or volunteers. Additionally, there remains a genuine dispute of material fact as to whether the content of the Account is more indicative of a campaign account or an official account. As such, there remains a material issue of fact as to whether Reed operated his Twitter account under color of law.

## IV. Plaintiff's Motion for Summary Judgment

Plaintiff contends there are no material facts in dispute and she has shown that Reed violated her First Amendment rights when he blocked her on Twitter as a matter of law. Plaintiff's argument proceeds in five parts. First, she argues Reed exercised government control over the Account. Second, Plaintiff argues the "interactive component" of the Account is a public forum because it was intentionally opened for public discourse and is compatible with expression. Third, Plaintiff claims Reed violated her First Amendment rights by blocking her access to the interactive component of the Account. Plaintiff claims by blocking her for a critical tweet, Reed engaged in

16

either viewpoint or content discrimination. Fourth, Plaintiff claims Reed operated the Account under color of state law. Finally, Plaintiff claims she has been injured and is entitled to relief. Specifically, Plaintiff requests the Court find Reed violated Plaintiff's First Amendment rights, enter an injunction prohibiting the President of the Board of Aldermen from blocking users on official social media, and for nominal damages.

For the reasons set forth above, the Court concludes that there remains a question of material fact as to whether Reed operated the Account under color of law. As such, Plaintiff is not entitled to summary judgment.

### V.  Conclusion

The Court concludes Reed may be sued in his official capacity pursuant to *Monell*, as he is the final policymaker with respect to social media in the President's Office. However, a question of fact remains as to whether Reed acted under color of law in operating the Account.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment [75] is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant's Motion for Summary Judgment [79] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file a reply in support of her Statement of Uncontroverted Material Facts [95] is **GRANTED**.

Dated this 28th day of March, 2022.

_____
JOHN A. ROSS
UNITED STATES DISTRICT JUDGE